**In re Pauline HAINES, d/b/a Polly's Place, Debtor.**

**Bankruptcy No. 98–11797–13.**

United States Bankruptcy Court, D. Montana, Butte Division.

May 10, 1999.

James A. Patten, West, Patten, Bekkedahl & Green, P.L.L.C., Billings, MT, James E. Torske, Hardin, MT, for debtor.

John Fredericks, III, Michael L. Chiropolos, Fredericks, Pelcyger, Hester & White, LLC, Louisville, CO, Sam S. Painter, Elk River Law Office, Billings, MT, for the Crow Indian Tribe.

## ORDER

JOHN L. PETERSON, Chief Judge.

A hearing in this case was held January 19, 1999, at Butte on Debtor's objection to the Proof of Claim filed by the Crow Tribe

of Indians. Present at the hearing were James A. Patten and James E. Torske on behalf of Debtor and John Fredericks, III and Sam S. Painter on behalf of the Crow Indian Tribe ("Tribe"). Exhibits 1–6 and A–J, L, M, P, Q, G, S, W, Y and Z, were introduced into evidence and the following testified: Debtor; Gordon Rose, owner and operator of a fishing/outfitting business located in Fort Smith, Montana; Denis Adams, Tax Commissioner for the Tribe; and Tyrone Ten Bear, enrolled member of the Tribe, member of the Tribal Tax Commission and staff assistant to the Chairwoman of the Tribe.

## I

Debtor commenced the instant Chapter 13 bankruptcy on June 26, 1998, by filing a voluntary bankruptcy petition. Debtor owns and operates, as a sole proprietorship, Polly's Place-consisting of a restaurant and six guest rooms. Polly's Place is located in Fort Smith, Montana on fee land within the exterior boundaries of the Crow Indian Reservation. Debtor testified, and the Tribe does not dispute, that the customers who partake in the services provided by Debtor at Polly's Place are mainly non-Indians who are on the Crow Indian Reservation fishing the Big Horn River.

The Crow Indian Tribe is a federally recognized Indian Tribe located in southeastern Montana. In 1995, the Crow Tribal Council enacted a Crow Tribal Resort Tax ("Resort Tax") which was approved by the Secretary of the Interior on June 9, 1995. Exhibit "P". The Resort Tax imposes a four percent (4%) tax on "gross re-

ceipts from all goods and services sold or used on the [Crow Indian] Reservation in connection with a resort business."[1] Exhibit "H", Crow Tribal Taxation Code, Chapters 4.02–Tax Imposed and 4.03–Tax Rate. Resort owners are required to collect the Resort Tax and remit the tax to the Tribe regardless of whether the tax is collected from customers. The Tribe obtains the proceeds of the Resort Tax by requiring owners of resort businesses to report their gross receipts from operations on a quarterly basis accompanied by a payment of the 4% Resort Tax (4% of gross receipts) for the quarter reported.[2] Exhibit "H", Crow Tribal Taxation Code, Chapter 4.04, Collection and Reporting.

Debtor has not filed any quarterly Resort Tax reports and refuses to collect the Resort Tax from her customers. On November 16, 1998, the Tribe filed its first Proof of Claim in this case, asserting a priority claim. Based on an estimate of Debtor's gross receipts for the quarters ending June 30, 1995, September 30, 1995, December 31, 1995, and March 31, 1996, the Tribe asserts that Debtor owes $31,-788.97.[3] Debtor filed an objection to this claim on November 24, 1998, asserting the Tribe does not have the authority to impose the Resort Tax upon Debtor.

The Tribe filed a second Proof of Claim on December 28, 1998, which claim amends the first claim filed by the Tribe on November 16, 1998. The second Proof of Claim asserts that the Tribe has a total claim in the sum of $98,790.07, of which $31,788.07 is secured and $67,002.00 is a priority claim. The secured portion of the

1. A "Resort Business" includes:
   [A]ny activity engaged in by and [sic] person or caused to be engaged in by a person with the object of gain, benefit or advantage, either directly or indirectly, and which involves providing goods or services to tourists or transient visitors to the Crow Indian Reservation.
   Crow Tribal Tax Code, Chapter 4.01(a). Exhibit "H".

2. The owner of a resort business may retain two percent (2%) of the total tax collected to

help defray the administration costs associated with collecting and remitting the tax. Crow Tribal Taxation Code, Chapter 4.04(2).

3. This amount is an estimate because Debtor failed to file Crow Tribal Resort Tax quarterly reports. The tax is based on gross receipts. Thus, the Tribe calculated the tax due by estimating Debtor's gross receipts and then assessing penalties and interest as provided in Chapter 3 of the Crow Tribal Taxation Code. Exhibits "B", "C", "D", "E" and "F".

claim represents the amounts as set forth in the first proof of claim. This amount was converted to a secured claim by virtue of the "Notice of Crow Tribal Tax Lien," issued July 25, 1996. Exhibit "A". The "Notice of Crow Tribal Tax Lien" shows that the $31,788.07 secured obligation consists of $11,172.00 in penalties and $1,996.07 in interest with the balance of $18,620.00 representing the actual Resort Tax. See Exhibit "I", Administrative Provisions (providing the Tribe with the authority to assess interest and penalties and to estimate taxes due).

The additional $67,002.00 is the result of taxes, penalties and interest assessed for the quarters beginning April 1, 1996, and ending June 25, 1998. Exhibit "G". The $67,002.00 priority claim consists of an estimated Resort Tax in the sum of $37,985.00, penalties in the sum of $21,168.00 and interest in the sum of $7,849.00. Exhibit "G".

Debtor filed an objection to the Tribe's second Proof of Claim on January 15, 1999. In addition, creditor Little Horn State Bank filed a concurrence with Debtor's original objection to the Tribe's first Proof of Claim. In the concurrence, Little Horn State Bank asserts that the "Tribe is without authority to impose a tax upon a non-member debtor such as Ms. Haines in connection with her business activities conducted on fee land on the reservation, and therefore, the Tribe's tax claim is invalid." In the alternative, Little Horn State Bank argues that its secured claim, which is secured by, among other collateral, a deed of trust dated November 30, 1992, "cannot, after the fact, be somehow made subject to and inferior to the Crow Tribe's alleged tax claim, which claim is without any statutory basis under either state or federal law."

In opposing Debtor's objection, the Tribe asserts first that although this Court has jurisdiction to determine the amount and legality of the Resort Tax imposed by the Tribe, the Court should defer to a prior decision of the Crow Tribal Court which upheld the Resort Tax here in question. The Tribe also asserts that in the event this Court does not defer to the Crow Tribal Court's decision, that it nonetheless has the authority to impose the Resort Tax at issue.

On January 15, 1999, Debtor and the Tribe filed a Stipulation with the Court agreeing that Debtor's objection to the Tribe's second Proof of Claim could be heard at the hearing scheduled on Debtor's objection to the Tribe's first Proof of Claim. At the conclusion of the January 19, 1999, hearing, the Court granted the parties fifteen days to file memorandum in support of their respective positions and took the matter under advisement. Debtor and the Tribe filed their respective briefs on February 3, 1999. Thus, the matter is deemed submitted and ready for decision.

II

Since this is a core proceeding under 11 U.S.C. § 157(b)(2)(B), the Court has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 157(b)(1) and 1334. Notwithstanding this Court's jurisdiction, the Tribe requests that the Court defer to the decision of the Crow Tribal Court in *Rose v. Adams*, No. 95–207 (Crow Tribal Court 1998), which upheld the Resort Tax. Exhibit "K". Relying on *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987), and *National Farmers Union Ins. Cos. v. Crow Tribe*, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), the Tribe reasons that "[i]nasmuch as the Debtor challenges the jurisdiction of the Tribe to enforce its resort tax, a proper respect for the authority of the tribal court to determine the jurisdiction issue in the first instance requires this Court to abstain, and require the Debtor to exhaust her tribal remedies." Tribe's Post Hearing Memorandum, p 8.

In *Farmers Union*, a leading case on tribal court jurisdiction, the Supreme Court established that federal courts, in an

effort to minimize "procedural nightmares" and as a matter of comity, should initially "stay[] its hand until after the Tribal Court has had a full opportunity to determine its own jurisdiction and to rectify any errors it may have made." *Farmers Union*, 471 U.S. at 857, 105 S.Ct. 2447 (footnote omitted). Such exhaustion of tribal remedies:

> [A]llow[s] a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed.... [This rule] will encourage tribal courts to explain to the parties the precise basis for accepting jurisdiction, and will also provide other courts with the benefit of their expertise in such matters in the event of further judicial review.

*Id.* at 856–57, 105 S.Ct. 2447. However, as explained in *Strate v. A–1 Contractors*, 520 U.S. 438, 448, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997), the decisions of *Farmers Union and Iowa Mutual* "describe an exhaustion rule allowing tribal courts initially to respond to an invocation of their jurisdiction; neither establishes tribal-court adjudicatory authority[.]"

■ In the unique realm of bankruptcy, the Court finds that the exhaustion rule set forth in *Farmers Union* and *Iowa Mutual* simply does not apply. 11 U.S.C. § 505(a) gives federal bankruptcy courts the authority to determine, in a bankruptcy proceeding, the amount and legality of any tax, except where the amount and legality of the tax has been "contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction" prior to the commencement of bankruptcy proceedings. As this Court previously explained:

> In reviewing Section 505 and the authorities cited by each party, as well as other decisions, there is no conflict among the decisions regarding the purpose and meaning of Section 505. The determination of a debtor's tax liability is a core proceeding under Section 157 of the Code and this Court thus has jurisdiction to determine the amount

and legality of the tax, except where such tax has been fixed by final order of an administrative or judicial tribunal, after being reasonably contested by the taxpayer. *In re Palm Beach Resort Properties, supra*, [51 B.R. 363 (Bankr. S.D.Fla.1985)]. As stated in *In re Northwest Beverage, Inc., supra*, 46 B.R. [631] at 634–635 [(Bankr.N.D.Ill. 1987)]:

> Section 505 is derived from the Bankruptcy Act sections which allowed the Court to hear and determine questions concerning the amount or legality of unpaid taxes. (Citing authority). Several Act cases have construed the language used in the predecessor Section to § 505 to mean that:

>> [W]here, after a hearing, a quasi-judicial body ... determines the amount of a tax due, with the right on the part of the taxpayer to a judicial review of the determination, all conformable with the requirements of due process, such determination, *upon becoming final by operation of law*, is conclusive upon a court of bankruptcy, save for mathematical error in the computation of the amount of the tax or legal error in its assessment. (Citing cases).

> \*      \*      \*      \*      \*      \*

> Section 505 of the Bankruptcy Code and the predecessor section in the Act were enacted to "... protect[s] the estate from the negligence or indifference of a debtor who has defaulted in tax assessment proceedings...." 3 COLLIER ON BANKRUPTCY, 505–23 (15th ed.1979). In enacting § 505, Congress was primarily concerned with protecting creditors from the dissipation of the estate's assets which could result if the creditors were bound by a tax judgment which the debtor, due to his ailing financial condition, did not contest. (Citing cases).

Clearly, this Court not only has the jurisdiction, but it has a duty, to determine the proper debt due Flathead County

since none of the taxes levied by such taxing authority have been finally adjudicated under Montana law. See *Dept. of Revenue v. Countryside Village*, 205 Mont. 51, 667 P.2d 936, 943 (1983).

*In re Brummer*, 15 Mont.B.R. 364, 372–373 (1996). As explained in *Brummer*, § 505 not only affords debtors the opportunity to seek prompt resolution of their tax liabilities but it also allows the administration of a case to proceed in a timely manner, thus providing a benefit to debtors and their creditors. If Debtor in this case were forced to seek resolution of the instant dispute in tribal court, Debtor's bankruptcy could effectively be put on hold for several months or perhaps even years. Thus, bankruptcy courts, by virtue of 28 U.S.C. § 157(a), are granted jurisdiction to determine the amount and/or legality of a tax, irrespective of jurisdictional issues, provided, however, that the tax has not been "contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction." In the case at bar, Debtor has not challenged the assessed tax in any manner, and thus, the Court finds that it has the authority to determine both the legality and the amount of the Resort Tax under § 505.

The Tribe nonetheless maintains that this Court should refrain from deciding the issue at hand and should instead follow the Crow Tribal Court's decision regarding the legality of the Resort Tax as set forth in *Rose v. Adams, supra.* For the reasons as set forth in this Order, the Court declines to do so.

### III

In 1975, the United States, in its own right and as fiduciary for the Tribe, filed a lawsuit against the State of Montana. *See Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). In that case, the Court summarized the establishment and history of the Crow Indian Reservation as follows:

The Crow Indians originated in Canada, but some three centuries ago they migrated to what is now southern Montana. In the 19th century, warfare between the Crows and several other tribes led the tribes and the United States to sign the First Treaty of Fort Laramie of 1851, in which the signatory tribes acknowledged various designated lands as their respective territories. See 11 Stat. 749 and 2 C. Kappler, Indian Affairs: Laws and Treaties 594 (1904) (hereinafter Kappler). The treaty identified approximately 38.5 million acres as Crow territory and, in Article 5, specified that, by making the treaty, the tribes did not "surrender the privilege of hunting, fishing, or passing over" any of the lands in dispute. In 1868, the Second Treaty of Fort Laramie established a Crow Reservation of roughly 8 million acres, including land through which the Big Horn River flows. 15 Stat. 649. By Article II of the treaty, the United States agreed that the reservation "shall be ... set apart for the absolute and undisturbed use and occupation" of the Crow Tribe, and that no non-Indians except agents of the Government "shall ever be permitted to pass over, settle upon, or reside in" the reservation.

Several subsequent Acts of Congress reduced the reservation to slightly fewer than 2.3 million acres. See 22 Stat. 42 (1882); § 31, 26 Stat. 1039–1040 (1891); ch. 1624, 33 Stat. 352 (1904); ch. 890, 50 Stat. 884 (1937). In addition, the General Allotment Act of 1887, ch. 119, 24 Stat. 388, and the Crow Allotment Act of 1920, 41 Stat. 751, authorized the issuance of patents in fee to individual Indian allottees within the reservation. Under these Acts, an allottee could alienate his land to a non-Indian after holding it for 25 years. Today, roughly 52 percent of the reservation is allotted to members of the Tribe and held by the United States in trust for them, 17 percent is held in trust for the Tribe itself, and approximately 28 percent is held in fee by non-Indians. The State of Montana owns in fee simple 2 percent of the

reservation, the United States less than 1 percent. *Montana*, 450 U.S. at 547–48, 101 S.Ct. 1245. The Eighth Circuit Court of Appeals, providing additional explanation regarding the General Allotment Act of 1887, *supra*, writes:

> Under the Indian General Allotment Act, 24 Stat. 388 (1887), significant portions of the Reservation were allotted to individual tribal members as part of Congress's widespread attempt to disestablish reservations and to force Indians to assimilate into the dominant white culture modeled on individual property ownership. After a period of years during which the allotments were held in trust, fee patents were issued. *See id.* at 398 § 5. Assisted by legislation aimed at opening the Reservation to non-Indian development, *see, e.g.,* 30 Stat. 1362 (1899), 34 Stat. 124 (1906), piecemeal sales of fee lands up to the time of the Indian Reorganization Act of 1934 created what is often called a "checkerboard" map of trust lands, tribal lands, allotted lands, and fee lands.

*Lower Brule Sioux Tribe v. State of South Dakota*, 104 F.3d 1017, 1021 (8th Cir.1997). Once "all the lands had been allotted and the trusts expired, the reservation could be abolished." *Mattz v. Arnett*, 412 U.S. 481, 496, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973).

In the instant case, land, such as the tract of land which Debtor owns in fee and upon which she conducts her business, was held in trust for a period of years after which fee patents were issued. General Allotment Act, 24 Stat. 388, 389, § 5. Over time, through sale and inheritance, non-members of the Tribe, such as Debtor, have come to own a substantial portion of the allotted land. The foregoing sets the backdrop for the issue presently before the Court: Whether the Tribe may impose a Resort Tax on non-Tribal members conducting business on fee land located inside the exterior boundaries of the Tribe. After careful consideration of an abundance of case law, the Court concludes that the Tribe does not have the authority/jurisdiction to impose the Resort Tax on non-Indians conducting business on fee land within the exterior boundaries of the Tribe, and therefore, sustains Debtor's objections to each proof of claim.

## IV

█ As articulated by Mr. Chief Justice Marshall over one hundred and sixty-five years ago, Indian nations are "distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all the lands within those boundaries, which is not only acknowledged, but guarantied by the United States." *Worcester v. Georgia*, 31 U.S. 515, 6 Pet. 515, 8 L.Ed. 483 (1832). It is against this well recognized backdrop which an Indian Tribe's criminal and civil jurisdiction has evolved. This doctrine has evolved, and to some extent has been eroded over the years as a result of the assimilation of Indians into the general community and the erosion of reservation borders as a result of the General Allotment Act. From this stems the generally recognized principal that "[t]he power to tax transactions occurring on trust lands and significantly involving a tribe or its members is a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law or necessary implication of their dependent status." *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 152, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980). With the above in mind, the Court embarks upon resolution of Debtor's objection.

█ The first question the Court must entertain is whether a treaty or federal statute exists which permits the Tribe to impose a tax, for the benefit of the Tribe, on non-Indian members conducting business on fee land. *See Montana*, 450 U.S. 544, 101 S.Ct. 1245. Absent a delegation of tribal authority by treaty or statute to impose a tax on non-Indians, a tribe generally lacks civil authority over the conduct of non-Indians on non-Indian land

within a reservation. *Id.*, *Strate*, 520 U.S. at 453, 117 S.Ct. 1404 ("Subject to controlling provisions in treaties and statutes, and the two exceptions identified in *Montana*, the civil authority of Indian tribes and their courts with respect to non-Indian fee lands generally 'do[es] not extend to the activities of nonmembers of the tribe'"). This general rule, however, is subject to two enumerated exceptions as set forth in *Montana*, *supra*. As explained therein:

> To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands.

*Montana*, 450 U.S. at 565, 101 S.Ct. 1245. First, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Id.* Second, "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 566, 101 S.Ct. 1245. In applying the *Montana* exceptions to particular cases, courts should be careful, however, that the exceptions do not subsume the rule. *Strate*, 520 U.S. 438, 117 S.Ct. 1404.

In the case at bar, the Tribe refers to no treaty authorizing it to impose the Resort Tax on non-Indians living and conducting business on non-Indian land. Indeed, as the Court concluded in *Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation*, 492 U.S. 408, 425, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989), "any regulatory power the Tribe might have under the treaty 'cannot apply to lands held in fee by non-Indians.'" (quoting *Montana*, 450 U.S. at 559, 101 S.Ct. 1245.). As the Supreme Court noted in its earlier decision in *Montana*: "There is simply no suggestion in the legislative history that

Congress intended that the non-Indians who would settle upon alienated allotted lands would be subject to tribal regulatory authority. Indeed, throughout the congressional debates, allotment of Indian land was consistently equated with the dissolution of tribal affairs and jurisdiction. See, *e.g., id.*, at 785 (Sen.Morgan), 875 (Sen.Hoar), 876 (Sen.Morgan), 878 (Sens. Hoar and Coke), 881 (Sen.Brown), 908 (Sen.Call), 939 (Sen.Teller), 1028 (Sen.Hoar), 1067 (Sens. Edmunds and Williams). It defies common sense to suppose that Congress would intend that non-Indians purchasing allotted lands would become subject to tribal jurisdiction when an avowed purpose of the allotment policy was the ultimate destruction of tribal government." *Montana*, 450 U.S. at 560, n. 9, 101 S.Ct. 1245.

There is also no contention that Congress has delegated to the Tribe the power to tax nonmembers located on nonmember-owned fee land. Thus, the question which this Court must answer is whether the Tribe's Resort Tax is warranted under either of the two exceptions as set forth in *Montana*, *supra*.

### 1. Consensual Relationship.

As previously explained, "[t]he first exception to the *Montana* rule covers 'activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.'" *Strate*, 520 U.S. at 456–457, 117 S.Ct. 1404 (citing *Montana*, 450 U.S. at 565, 101 S.Ct. 1245). Cases which have addressed the jurisdiction of an Indian tribe under the first *Montana* exception include: *Colville*, 447 U.S. 134, 100 S.Ct. 2069; *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982); *Morris v. Hitchcock*, 194 U.S. 384, 24 S.Ct. 712, 48 L.Ed. 1030 (1904); and *Buster v. Wright*, 135 F. 947 (8th Cir.1905).

In *Colville*, the Confederated Tribes of the Colville Reservation sought to preclude the State of Washington from imposing a

488

cigarette and tobacco products tax on sales by on-reservation tobacco outlets to non-tribal members. The Court in *Colville* relied to a great extent on its earlier decision of *Moe v. Confederated Salish & Kootenai Tribes of the Flathead Reservation,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976),[4] in upholding the State of Washington's authority to impose the cigarette tax. However, prior to upholding the State of Washington's authority to tax tribal sales to non-tribal members, the Supreme Court in *Colville* acknowledged:

> The power to tax transactions occurring on trust lands and significantly involving a tribe or its members is a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law or necessary implication of their dependent status. Cf. *United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978).

\* \* \*

According to the Solicitor of the Department of the Interior:

> "Chief among the powers of sovereignty recognized as pertaining to an Indian tribe is the power of taxation. Except where Congress has provided otherwise, this power may be exercised over members of the tribe and over nonmembers, so far as such nonmembers may accept privileges of trade, residence, etc., to which taxes may be attached as conditions." *Ibid.* (emphasis added).

*Colville,* 447 U.S. at 152–53, 100 S.Ct. 2069. The tribe in *Colville* argued that allowing the State of Washington to impose a sales tax on cigarette and tobacco products would have a negative impact on the Tribe's ability to generate revenue. In that case, the sales generated by the sale of cigarettes at a discounted price to non-tribal members generated substantial revenues which were "expend[ed] for essential

governmental services, including programs to combat severe poverty and underdevelopment at the reservations." *Id.* at 154, 100 S.Ct. 2069. Acknowledging the validity of the tribe's argument, the Supreme Court wrote:

> While the Tribes do have an interest in raising revenues for essential governmental programs, that interest is strongest when the revenues are derived from value generated on the reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal services.

*Id.* at 156–157, 100 S.Ct. 2069. Despite recognizing the foregoing, the Court in *Colville* nonetheless found the Tribe's argument unpersuasive and instead followed the prior precedent established in Moe, which upheld a state's imposition of a cigarette tax "insofar as sales to non-Indians were concerned, because its legal incidence fell on the non-Indian purchaser." *Colville,* 447 U.S. at 150–151, 100 S.Ct. 2069 (footnote omitted).

In *Merrion v. Jicarilla Apache Tribe,* the Jicarilla Apache Tribe of New Mexico sought to impose a severance tax on oil and natural gas removed from tribal trust property. *Merrion,* 455 U.S. at 133, 102 S.Ct. 894. The oil and natural gas so removed was also subject to a severance tax levied by the State of New Mexico. *Id.* at 136, 102 S.Ct. 894. In that case, the Apache Tribe was granted authority to impose the tax under the first *Montana* exception. *Id.* at 137–138, 102 S.Ct. 894. The Supreme Court, citing numerous passages from its earlier decision in *Colville,* recognized first:

> The power to tax is an essential attribute of Indian sovereignty because it is a necessary instrument of self-government and territorial management. This power enables a tribal government to raise revenues for its essential services.

4. In *Moe,* the State of Montana sought to impose a cigarette tax on sales by smoke-shops operated by tribal members and located on leased trust lands within the reservation, and sought to require the smoke-shop operators to collect the tax.

*Id.* at 137, 100 S.Ct. 2069. In *Merrion,* unlike in *Colville,* the Supreme Court found that the petitioners "benefit[ed] from the provision of police protection and other governmental services, as well as from 'the advantages of a civilized society'" and that "tribes enjoy authority to finance their governmental services through taxation of non-Indians *who benefit from those services.*" *Id.* at 137–140, 100 S.Ct. 2069. Such ruling is in full accord with the Supreme Court's statement in *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 336, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983), that an entity "seeking to impose a tax on a transaction between a tribe and nonmembers must point to more than its general interest in raising revenues."[5] Despite its holding, the Supreme Court in *Merrion* nonetheless recognized the "significant territorial component to tribal power." *Merrion,* 455 U.S. at 142, 102 S.Ct. 894 ("a tribe has no authority over a nonmember until the nonmember enters tribal lands or conducts business with the tribe").

In *Morris v. Hitchcock,* the complainants sought to enjoin the defendants from interfering with their livestock, which were grazing on land in the Chickasaw Nation, Indian territory, under contracts with individual members of the Chickasaw Tribe. 194 U.S. at 384–85, 24 S.Ct. 712. The law under which the complainant's livestock were seized provided:

> That any non-citizen who owns horses, jacks, jennets, mules, or other cattle, and who holds them upon the public domain or within the Chickasaw Nation, shall be required to pay an annual permit tax of twenty-five cents per head for each horse, jack, or jennet, mule, or bovine, and five cents per head for each sheep and goat so held within this nation.

*Morris,* 194 U.S. at 390, 24 S.Ct. 712. In upholding the permit tax, the Supreme Court quoted a passage from an opinion of Attorney General Griggs and Attorney General Knox:

> It is the duty of the Department of the Interior to remove all classes forbidden by treaty or law, who are within the domain of the Five Civilized Tribes without Indian permission; to close all businesses which require permit or license and are being conducted without the same; and to remove all cattle which are being pastured on said land without Indian permit or license.

*Id.* at 392, 24 S.Ct. 712. Relying in large on a report made to the Senate by the Committee on the Judiciary which stated that the tax on cattle grazing had "a twofold object-to prevent the intrusion of unauthorized persons into the territory of the Chickasaw Nation, and to raise revenue," the Supreme Court upheld the validity of the tax. *Morris,* 194 U.S. at 389, 393, 24 S.Ct. 712.

In the fourth oft cited case, *Buster v. Wright,* the Creek Nation imposed a license fee as a condition precedent to the exercise of the privilege of trading within its borders. 135 F. at 949. There, nonmembers were the owners of improvements on lots located within the exterior boundaries of the Creek Nation. The nonmembers argued that this fact combined with the fact that they intended to purchase the lots upon which the improvements were located shielded them from paying the permit fee imposed by the Tribe.[6] The Eighth Circuit Court of Appeals rejected the non-Indian Merchant's argument reasoning the Creek Nation:

> [H]eld its territory under a patent from the United States and under an act of

---

5.  In *New Mexico,* the Supreme Court's statement was made in reference to a state seeking to impose a tax but this Court finds the Court's statement equally applicable whether it is a state or an Indian tribe seeking to impose a tax.

6.  In *Buster,* the Eighth Circuit found that the permit fee was more in "the nature of a license than of an ordinary tax, because it has the optional feature of the former and lacks the compulsory attribute of the latter." *Buster,* 135 F. at 949.

Congress which expressly provided that it should be the country of the Creeks "so long as they shall exist as a nation and continue to occupy" it. They still exist as a nation, and they still continue to occupy that country, notwithstanding the fact that those who are noncitizens of their tribe hold the title to and occupy isolated lots and tracts of land therein. Over this country the treaties of 1832 (7 Stat. 368, art. 14), of August 7, 1856 (11 Stat. 703, art. 15), and of June 14, 1866 (14 Stat. 788, art. 10), guarantied the full jurisdiction of the government of this tribe so far as the acts of its government should not be violative of the Constitution and laws of the United States.

*Id.* at 952–53.

■ The above four cases demonstrate that the Tribe in this case does not have the authority to impose the Resort Tax. In the instant case, Debtor has not entered into any consensual relationship with the Tribe. Debtor testified, without dispute, that the majority of her customers are not members of the Tribe and there was no testimony that the Tribe provides any of the products used by Debtor in her business. Furthermore, as noted in *Brendale*, 492 U.S. 408, 109 S.Ct. 2994, a consensual relationship does not arise between a tribe and a non-member simply by virtue of the non-members status as a landowner within reservation boundaries. *Id.* at 428, 109 S.Ct. 2994 (the Court found the first exception not applicable, recognizing that the nonmember landowners in that case had not entered into "a 'consensual relationship' with the Yakima Nation simply by virtue of their status as landowners within reservation boundaries, as *Montana* itself necessarily decided.").

Debtor and Gordon Rose ("Rose") also testified that utilities are not provided by the Tribe. For example, water and sewer are provided by a Montana corporation and garbage is removed by BFI to a County dump just off a County road by private contract. In addition, Debtor and Rose, conceding that the Tribe is required to provide some emergency medical services, testified that the majority of medical services are obtained from off-reservation sources although some services are also provided by the National Park Service. In addition, ambulance service is provided by a private service out of Hardin, Montana, i.e., non-tribal. Rose also testified that as far as he was aware, the Tribe provided no road maintenance as the Tribe does not have a road maintenance department. Finally, both Debtor and Rose testified that law enforcement support for nonmembers is generally provided by the County Sheriff. Over a several year period, both Debtor and Rose had only seen the tribal police on one or two occasions. The testimony presented at the hearing shows that virtually no Tribal services are available to nonmembers and if any services are available, it does not appear that Debtor has in any way attempted to avail herself to them.

Despite the lack of Tribal services available to nonmembers within the tribal borders, the Tribe nonetheless argues that nonmembers and tourism create an economic drain on the Tribe's limited resources. The Court finds the Tribe's position without merit. Based upon the uncontroverted testimony of Debtor and Rose, the Court finds any limited services or benefits which Debtor may receive by virtue of owning property within the exterior boundaries of the Tribe do not create an economic drain on the Tribe nor do they give rise to the type of consensual relationship contemplated in *Montana*.

In section II of this opinion, the Court indicated that it declined to follow the Crow Tribal Court's decision in *Rose v. Adams*. In that case, the Crow Tribal Court found that the Supreme Court's ruling in *Montana* did not apply to the Resort Tax because the tax is not imposed upon activities that take place on fee patented lands. The Tribal Court instead relied on *Colville* and *Merrion*, finding that "a tribe's power to tax nonmembers derives from its general sovereign authori-

ty to 'control economic activity within its jurisdiction, and to defray the cost of providing governmental services by requiring contributions from persons or enterprises engaged in economic activity within that jurisdiction.'" Exhibit "K", page 9. The Tribal Court found such reasoning applicable because in its view, the Tribal government performs an array of functions similar to those performed by municipal, county and state governments. The evidence presented to this Court simply does not comport with the Tribal Court's holding. Contrary to the Tribal Court, this Court finds the reasoning of *Montana* is applicable. Moreover, the evidence before this Court does not demonstrate that the Tribe provides to nonmembers, services similar to those provided by municipal, county and state governments.

The Tribe also urges that this case is controlled by the decision of the United States District Court for the District of New Mexico in *Atkinson Trading Co., Inc. v. Gorman, et al,* (Civ. No. 97–1261), Exhibit "J". In *Atkinson,* the Navajo Tribe of New Mexico sought to impose a Hotel Occupancy Tax on nonmembers who operated on fee land within the Navajo reservation. In this respect, *Atkinson* is factually indistinguishable from the instant case. The similarity between *Atkinson* and the instant case, however, ends here.

In *Atkinson,* the Court instructs that "[t]he real question with respect to tribal-taxation cases and the consensual-relationships test is whether the nonmembers' consensual activity within Indian Country is significant enough to allow the tribe to tax the activity." *Id.* at 13. In particular, "the extent to which a tribe will be allowed to regulate or affect non-Indian activity is often determined on a sliding scale, balancing the impact of the activity on the tribe with the severity of the tribe's proposed regulation, taxation, or other imposition of jurisdiction." *Id.* at 14. There, the District Court found enough significant consensual activity because: (1) tribal police were the primary provider of police protection; (2) fire protection was afforded by the tribal fire department; (3) emergency medical services were available from a tribal entity; and (4) the tribe maintained a tourism department which helped promote the non-Indian's business. The court in *Atkinson* concluded that it was not dealing with a situation where the tribe had nothing to do with the fee land activity, save tax it. The result in this case is different because the Tribe provides none of the services identified in *Atkinson,* and after applying the balancing test, this Court finds that the scales tip in Debtor's favor.

Also, the District Court of New Mexico in *Atkinson* correctly found "that the consensual-relationship test of *Montana* and *Strate* is the proper framework within which to analyze this taxation case." Exhibit "J", page 12. The court's statement in the *Atkinson* decision—which decision the Tribe urges this Court to follow—puts it at odds with the Crow Tribal Court's decision in *Rose v. Adams* —another case the Tribe urges this Court to follow—which rejected the applicability of *Montana.* As noted earlier, this Court agrees that *Montana* is applicable.

*Colville, Merrion, Morris, Buster* and *Atkinson* illustrate that there must be some nexus between the Tribe and a non-tribal member for the Tribe to acquire civil authority and/or jurisdiction over the non-member. In the instant case, that nexus does not exist. Because no consensual relationship exists between Debtor and the Tribe, the Tribe does not have the authority to impose its Resort Tax on Debtor under the first *Montana* exception. This, however, does not end the Court's inquiry. The Tribe may also have authority to impose its Resort Tax under the second *Montana* exception.

2. Inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

▇ Cases addressing the second Montana Exception include *Strate v. A–1 Con-*

*tractors,* 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661; *Duro v. Reina,* 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990); *Brendale v. Confederated Tribes and Bands of the Yakima Nation,* 492 U.S. 408, 109 S.Ct. 2994; *Fisher v. District Court of the Sixteenth Judicial District of Montana,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976); and *Sanders v. Robinson,* 864 F.2d 630 (9th Cir.1988). The case of *Strate* involved a traffic accident which occurred within the boundaries of the Fort Berthold Indian Reservation. Two persons were involved in the accident, one a tribal member and the other a nonmember. The accident happened on a portion of a public highway maintained by the State of North Dakota under a federally granted right-of-way over Indian reservation land. The Supreme Court in *Strate* found that the tribal court could not entertain a civil against the nonmember under the second Montana exception. While recognizing that "those who drive carelessly on a public highway running through a reservation endangered all in the vicinity, and surely jeopardize the safety of tribal members", the Supreme Court found that the exceptions only applied in certain enumerated circumstances:

> Read in isolation, the *Montana* rule's second exception can be misperceived. Key to its proper application, however, is the Court's preface: "Indian tribes retain their inherent power [to punish tribal offenders,] to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members.... But [a tribe's inherent power does not reach] beyond what is necessary to protect tribal self-government or to control internal relations." 450 U.S., at 564, 101 S.Ct., at 1257–1258.

*Strate,* 520 U.S. at 459, 117 S.Ct. 1404. Here, the Tribe's ability to impose the Resort Tax does not interfere with the Tribe's right to make its own laws or to be ruled by them. As explained in *Duro,* "the retained sovereignty of the tribes is that needed to control their own internal relations, and to preserve their *own* unique customs and social order." *Duro,* 495 U.S. at 685–86, 110 S.Ct. 2053. Again, Debtor's operation of her business does not interfere with the Tribe's internal relations nor does it deteriorate the Tribe's unique customs and social order. The Tribe retains these attributes of its sovereignty regardless of the Resort Tax and regardless of Debtor, who poses no threat to the Tribe. *See Brendale,* 492 U.S. at 430–31, 109 S.Ct. 2994 (a nonmember's activity must have a *"demonstrably serious"* impact on the political integrity, economic security, or health or welfare of the Tribe to fall within the second *Montana* exception.).

In *Fisher v. District Court,* the Supreme Court reversed a holding of the Montana Supreme Court conferring jurisdiction to the state courts over adoption proceedings where all parties were members of the Northern Cheyenne Tribe and were residing on the reservation. The Supreme Court in that case found that "State-court jurisdiction plainly would interfere with the powers of self-government conferred upon the Northern Cheyenne Tribe and exercised through the Tribal Court." *Fisher,* 424 U.S. at 387, 96 S.Ct. 943. The Court observed in *Fisher* that state courts may not exercise jurisdiction over disputes arising out of on-reservation conduct—even over matters involving non-Indians—if doing so would " 'infring[e] on the right of reservation Indians to make their own laws and be ruled by them.' " *Id.,* at 386, 96 S.Ct. at 946 (citation omitted). Accord *Strate,* 520 U.S. at 459, 117 S.Ct. 1404 ("tribe's retain their inherent power ... to regulate domestic relations among members").

Finally, in *Sanders v. Robinson,* the Ninth Circuit Court of Appeals affirmed a district court's finding that the Northern Cheyenne tribe of Montana had jurisdiction over a non-Indian husband in a divorce and custody proceeding where the husband and his Indian spouse resided on the reservation with their children before

dissolution of the marriage. The Ninth Circuit in that case first examined the Northern Cheyenne Constitution, which gave the Tribal Council power "to regulate the domestic relations of members of the Tribe and of non-members married into the Tribe." *Sanders,* 864 F.2d at 633 (quoting Art. III, § 1(p)). The Court in *Sanders* noted with approval the Montana Supreme Court's previous holding that the exercise of state jurisdiction over the domestic relations of reservation residents could be an interference with tribal self government. *See Marriage of Limpy,* 195 Mont. 314, 636 P.2d 266 (1981).

After careful examination of the case law, and the facts of this case, the Court finds that prohibiting the Tribe from imposing its Resort Tax on Debtor does not, in any way, infringe on the Tribe's right to "make their own laws and be ruled by them." *See Williams v. Lee,* 358 U.S. 217, 220, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). As noted above:

> While the Tribes do have an interest in raising revenues for essential governmental programs, that interest is strongest when the revenues are derived from value generated on the reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal services.

*Colville,* 447 U.S. at 156–157, 100 S.Ct. 2069. In the case at bar, Debtor and Rose both testified that they receive few if any services from the Tribe. Moreover, the Resort Tax which the Tribe seeks to impose is applied in a discriminatory matter. As set forth in Chapter 4.14 of the Crow Tribal Tax Code: "Any resort business owned by, or purchases made by, the Crow Tribe, a state or the United States, or any subdivision thereof, shall be exempt from the requirements of this Chapter."

### V

In this case, the Crow Indian Tribe seeks to impose a sales tax on nonmembers living on fee land located within the exterior boundaries of the reservation. The tax sought to be imposed has no nexus to the Tribe and is imposed in a discriminatory manner. As the Supreme Court aptly writes in *Bourland III,* 508 U.S. at 689, 113 S.Ct. at 2316:

> *Montana* and *Brendale* establish that when an Indian tribe conveys ownership of its tribal lands to non-Indians, it loses any former right of absolute and exclusive use and occupation of the conveyed lands. The abrogation of this greater right, at least in the context of the type of area at issue in this case, implies the loss of regulatory jurisdiction over the use of the land by others.

In sum, Debtor has overcome the *prima facie* effect given the Tribe's claims by F.R.B.P. 3001(f). Thus, the burden then fell on the Tribe to prove the validity of its claims by a preponderance of the evidence. *In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173–74 (3rd Cir.1992). The Tribe has failed to meets its burden. Simply put, principles of federal Indian law, whether stated in terms of preemption, tribal self-government, or otherwise, do not permit the Tribe to impose its Resort Tax on the Debtor. Accordingly,

IT IS ORDERED Debtor's Objection to the Proofs of Claim filed by the Crow Indian Tribe are sustained; and the Proofs of Claim filed by the Crow Indian Tribe are denied.