**In re Pauline HAINES,**
**d/b/a Polly's Place.**

**No. CV 99–67–BLG–JDS.**

United States District Court,
D. Montana,
Billings Division.

Jan. 26, 2000.

John Fredericks, III, Fredericks, Pelcyger, Hester & White, Louisville, CO, Sam S. Painter, Elk River Law Office, Billings, MT, for Appellant.

James A. Patten, West, Patten, Bekkedahl, & Green, PLLC, Billings, MT, James E. Torske, Torske Law Office, Hardin, MT, for Appellee.

## ORDER

SHANSTROM, Chief Judge.

This matter comes before the Court on appeal from the Bankruptcy Court's Order denying the proofs of claim filed by the Crow Tribe of Indians. *In re Pauline Haines, d/b/a Polly's Place, Debtor,* 233 B.R. 480 (Bkrtcy.D.Montana, 1999).

■ The Bankruptcy Court's findings of fact are reviewed under the clearly erroneous standard. Fed.R.Bankr.P. 8013. Its conclusions of law are reviewed *de novo. O'Malley Lumber Co. v. Lockard,* 884 F.2d 1171, 1174 (9th Cir.1989).

The facts are set out in great detail in the Bankruptcy Court's order and shall not be repeated here except to the extent they are pertinent to this Court's discussion or the Court finds them clearly erroneous. This case presents the issue of whether an Indian tribe can impose a 4% tax on the gross receipts from all goods and services sold or used in connection with a nonmember owned business located on nonmember fee land within the exterior boundaries of an Indian reservation.

Debtor Pauline Haines, a non-Indian, owns and operates Polly's Place, a restaurant and six guest rooms. Polly's Place is located in Fort Smith, Montana, on nonmember fee land within the exterior boundaries of the Crow Indian Reservation. Access to Polly's Place is gained by traveling over both interstate and county roads open to the public. Debtor's customers are mainly non-Indians who are on the Crow Indian Reservation fishing the Big Horn River.[1]

The Crow Tribe seeks to impose a 4% Resort Tax on the debtor's "gross receipts from all goods and services sold or used on the Reservation in connection with a resort business." The Crow Tribe submitted proofs of claim to the Bankruptcy Court asserting a total claim in the sum of $98,-790.07 in unpaid taxes, interest, and penal-

ties. After a lengthy discussion, the Bankruptcy Court concluded that "principles of federal Indian law, whether stated in terms of preemption, tribal-self government or otherwise, do not permit the Tribe to impose its Resort Tax on the Debtor." *In re Pauline Haines,* 233 B.R. at 493. The Tribe takes exception with the Bankruptcy Court's conclusion.

■ Indian tribes retain the inherent sovereign power to tax. *See Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 152–54, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980) (hereafter *Colville* ). However, as a general rule "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Montana v. United States,* 450 U.S. 544, 565, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); *See Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation,* 492 U.S. 408, 425–26, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989) (tribe's sovereignty divested in cases involving relations between an Indian tribe and nonmembers of the tribe); *See United States v. Wheeler,* 435 U.S. 313, 326, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). This general rule is subject to the following two well-known, and much discussed, exceptions:

> [I]ndian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservation, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. [citations omitted] A tribe may also retain power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the

1. Debtor testified that approximately 2% of her restaurant business, and none of her mo-

tel business, is generated from transactions with tribal members.

economic security, or the health or welfare of the tribe. (emphasis added)

*Montana,* 450 U.S. at 565–66, 101 S.Ct. 1245. These principles were recently reiterated in *Strate v. A–1 Contractors,* 520 U.S. 438, 453, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997), where the Court again recognized that,

> [s]ubject to controlling provisions in treaties and statutes, and the two exceptions identified in *Montana,* the civil authority of Indian tribes and their courts with respect to non-Indian fee lands generally "do[es] not extend to the activities of nonmembers of the tribe." [*Montana,* 450 U.S. at 565, 101 S.Ct. 1245].

■ The Crow Tribe contends, based on *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982), and *Colville,* that the resort tax is valid. While both cases focused on whether tribes retain the inherent sovereign power to tax nonmembers on tribal lands and from where the tribes derive such authority to tax, neither involved taxation of the activities of nonmembers on non-member fee land. To the contrary, in both cases the transactions that were taxed all took place on trust or Indian land and were commercial transactions (sales and leases) between nonmembers and the tribes (or tribal members). For instance, in *Colville,* the Court upheld tribal sales taxes imposed upon non-Indian purchasers of cigarettes who bought their cigarettes from Indian tobacco dealers, on trust land, within the exterior boundaries of the various reservations. The Court acknowledged the limited nature of the Tribe's power to tax.

> The power to tax transactions occurring on trust lands and significantly involving a tribe or its members is a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law or necessary implication of their dependent status.

*Colville,* 447 U.S. at 152, 100 S.Ct. 2069. In this case, unlike *Colville,* the transactions sought to be taxed occur on nonmember fee land and do not significantly involve the tribe or its members.

In *Merrion,* the Court upheld a tribal severance tax on oil and gas removed from tribal trust land by non-Indian lessees who had entered into long term mineral leases with the Jicarilla Apache Tribe. However, the *Merrion* Court also recognized that the inherent sovereign power to tax nonmembers is limited.

> [A] tribe has the power to tax nonmembers only to the extent the nonmember enjoys the privilege of trade or other activity on the reservation to which the tribe can attach a tax. This limitation on tribal taxing authority exists not because the tribe has the power to exclude nonmembers, but because the limited authority that a tribe may exercise over nonmembers does not arise until the nonmember enters tribal jurisdiction. We do not question that there is a significant territorial component to tribal power: a tribe has no authority over a nonmember until the nonmember enters tribal lands or conducts business with the tribe.

*Merrion,* 455 U.S. at 141–42, 102 S.Ct. 894.

■ Both *Colville* and *Merrion* recognized that before a tribe has jurisdiction to exercise its sovereign authority and tax a nonmember, there must be a nexus[2] between the tribe and the nonmember. Both Courts also recognized that such nexus exists when a nonmember enters tribal lands, conducts business with the tribe, or both. As indicated above, the transactions taxed in *Merrion* and *Colville* were sales/leases, between nonmembers and the tribes or their members, that took place on trust and Indian lands. The tribal nexus, and consequently jurisdiction to exercise sovereign authority over nonmembers, was painfully evident in both cases. Thus, the Court did not have to refer to the *Mon-*

---

**2.** The Court uses "nexus" not as a term of art, but as a general descriptive term.

*tana* exceptions which identify two broad categories of circumstances where a tribal nexus can be found but where such nexus, and consequently tribal jurisdiction, is not based upon conduct or activity which occurs on tribal land.

Much of the discussion in *Merrion* centers around the source of a tribe's inherent sovereign power to tax. The Court determined that a tribe's authority to tax derives not from its power to exclude non-Indians from tribal lands, but from its power to govern and to raise revenues to pay for the costs of government. *Merrion,* 455 U.S. at 143–44, 102 S.Ct. 894. This portion of the holding in *Merrion* was necessitated not only because the issue was raised by the parties, but also by the fact that although the taxed transactions took place on tribal lands under long-term leases entered into with the tribe, thus engendering the tribe with jurisdiction over such nonmember transactions, the tribe no longer had the power to exclude nonmembers from such tribal lands.

The Court's conclusion in *Merrion,* however, is not surprising because the *Montana* Court had already recognized that the exercise of a tribe's sovereign authority over nonmembers is not coextensive with the power to exclude. In fact, *Montana* sets forth a specific test to determine under what circumstances (the two recognized *Montana* exceptions) a tribe can exercise its inherent sovereign authority over a nonmember when the power to exclude is nonexistent.

■ In this case, unlike *Merrion* and *Colville,* there exists no patently evident nexus between the Crow Tribe and the debtor. Such nexus is a prerequisite to the exercise of the Crow Tribe's jurisdiction, including the ability to tax the debtor. *Merrion,* 455 U.S. at 137 and 142, 102 S.Ct. 894. The Tribe's position appears to be based, in part, upon the erroneous premise that a nonmember is subject to the Tribe's jurisdiction simply because the nonmember does business within the exterior boundaries of the reservation, even if the business is conducted on nonmember fee land and does not significantly involve the Tribe. The inherent sovereign powers of a tribe are not so broad. *See Montana,* 450 U.S. at 565–66, 101 S.Ct. 1245; *Brendale,* 492 U.S. at 425–26, 109 S.Ct. 2994; *Wheeler,* 435 U.S. at 326, 98 S.Ct. 1079; *Colville; Merrion,* and *Strate,* 520 U.S. at 453, 117 S.Ct. 1404.

■ The Tribe's position is tantamount to permitting the exercise of the Tribe's inherent sovereign power over the nonmember debtor simply by virtue of her status as a landowner within reservation boundaries. *Montana, Brendale,* and *Strate,* specifically prohibit such exercise of sovereign power. Unless the Tribe can establish one of the exceptions delineated in *Montana,* the activities of the nonmember debtor on her fee land are not within the tribe's jurisdiction.

The Crow Tribe argues that the resort tax is valid because the debtor does business "on the reservation" and the debtor and her customers "benefit from the provision of police protection and other governmental services, as well as from the advantages of a civilized society that are assured by the existence of tribal government." *Merrion,* 455 U.S. at 137, 102 S.Ct. 894. This "advantages of a civilized society" argument suffers from two fatal defects.

The premise of the argument is that nonmembers should pay taxes to defray the cost of governmental services provided by the tribe because the nonmembers enjoy the benefits of such services. However, the Tribe has failed to come forward with evidence that it provides any significant governmental services. To the contrary, even the Tribe's own expert recognizes that the Bureau of Indian Affairs, Indian Health Services, and other federal agencies provide, and pay for, the vast majority of the governmental services referred to. Instead, the Tribe's expert contends that the federal government's expenditures and services should be counted as part of the services provided by the

Tribe. The Crow Tribe and the federal government, however, are not the same entity. It is inconsistent with the exercise sovereign authority for the Tribe to attempt to collect taxes to finance governmental services when those services are being provided, and paid for, by the federal government. In fact, it reflects the Tribe's dependent status.

More importantly, the "advantages of a civilized society" argument requires that the nonmember first be within the tribe's jurisdiction before the tribe can exercise its inherent sovereign authority to tax. In *Merrion* the tribe's jurisdiction over nonmembers was predicated upon two facts. First, the nonmembers had entered into long term mineral leases with the tribe. Second, under the terms of those leases, the nonmembers were removing oil and gas from trust land. As demonstrated throughout, the debtor in this case is not within the tribe's jurisdiction solely because she owns fee land within the exterior boundaries. The advantages of a civilized society theory is not a jurisdictional test, but is instead simply a recognition of the source of a tribe's power to tax once jurisdiction over a nonmember has been established.

■■■ The Tribe contends that the debtor's customers, who bear the legal incidence of the resort tax, have engaged in consensual relationships with the Tribe by virtue of their voluntary presence on the reservation and their enjoyment of the benefits provided by the Tribe and funded by tax revenues. First, the Court disagrees that simple presence of the debtor's customers on tribal land, without more[3], constitutes a consensual relationship under *Montana.* Second, the relationship, if any, between the Crow Tribe and customers of the debtor is immaterial to whether the Tribe can assess and collect a tax from the debtor's activities occurring on her fee land. It is the relationship between the debtor and the Tribe which is the key.

■■■ Even assuming simple presence on the reservation by the debtor's nonmember customers constitutes a consensual relationship between the customers and the Crow Tribe, taxing transactions between nonmember customers and the nonmember debtor on fee land exceeds the inherent sovereign authority of the tribe because the exercise of such sovereign authority extends only to regulation of the particular conduct, activity, or trade that gives rise to the consensual relationship between the tribe and the nonmember. *See Montana,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493; *Merrion,* 455 U.S. 130, 102 S.Ct. 894; *Morris v. Hitchcock,* 194 U.S. 384, 24 S.Ct. 712, 48 L.Ed. 1030 (1904); *Colville,* 447 U.S. 134, 100 S.Ct. 2069. While nonmember customers who enter tribal lands may have submitted to the tribe's jurisdiction, with respect to activities on her fee land, the nonmember debtor has not.

The Tribe also contends that the first *Montana* exception is satisfied because the debtor generates 2% of her restaurant business from sales to tribal members. *Montana* and its progeny afford the tribe the ability exercise its sovereign authority only over the particular conduct, activity, or trade that gives rise to the consensual relationship between the tribe and the nonmember. All of debtor's motel business and 98% of her restaurant business is generated from transactions with nonmembers. With respect to these nonmember transactions there exists no consensual relationship with the tribe or its members.

■■■ The Tribe next argues that the second *Montana* exception is satisfied because the refusal of the debtor to collect the tax from her customers deprives the Tribe of needed revenue to help defray the costs of government. Under this exception the Tribe may exercise its inherent sovereign power over the conduct of nonmembers on fee lands "when that conduct

---

**3.** The Court uses the term "without more" because *Merrion* recognized that there must at least be economic activity on tribal lands before a tax can be imposed.

threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana,* 450 U.S. at 565–66, 101 S.Ct. 1245. Thus, in order for the Tribe to be able to exercise its sovereign authority to tax the debtor, the Tribe must show that her sales to nonmembers, not her failure to pay the tax, threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the Tribe. The debtor's sales do not. The direct effect on the political integrity, economic security, health. or welfare of the tribe is a prerequisite to the tribe's ability to exercise its sovereign power over a nonmember. The Tribe cannot first impose the tax then attempt to justify the tax based upon the purported effect on the Tribe of the debtor's failure to pay the tax.

■ Finally, the Crow Tribe contends that the Bankruptcy Court erred when it determined that no treaty authorizes the Tribe to impose the resort tax on nonmembers living and conducting business on nonmember fee land. "[A]bsent express authorization by federal statute or treaty, tribal jurisdiction over the conduct of nonmembers exists only in limited circumstances." *Strate v. A–1 Contractors,* 520 U.S. at 445, 117 S.Ct. 1404. The Tribe, however, has failed to direct the Court to any treaty, or provision thereof, which expressly authorizes the Tribe to impose the resort tax upon the debtor. Arguing that the Tribe "reserved all aspects of its inherent sovereignty in its treaty of 1868" does not make a case for express authorization to impose the instant tax.

For the foregoing reasons **IT IS HEREBY ORDERED** that the instant appeal is dismissed and the judgment of the Bankruptcy Court is affirmed.

The Clerk of Court shall forthwith notify the parties of the making of this Order.