# MORRIS v. HITCHCOCK.

APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 272. Submitted April 29, 1904.—Decided May 16, 1904.

The constitutionality of the Curtis Act, 30 Stat. 495, for the protection of the Indian Territory has been settled by this court and is not now open to question. *Stephens* v. *Cherokee Nation,* 174 U. S. 445; *Cherokee Nation* v. *Hitchcock,* 187 U. S. 294.

The act of the Chickasaw Nation, approved by the Governor May 5, 1902, and by the President of the United States May 15, 1902, prescribing privilege or permit taxes, and the regulations of the Secretary of the Interior of June 3, 1902, governing the introduction by non-citizens of live stock in the Chickasaw Nation are valid, and not an exercise of arbitrary power, and they do not in any respect violate the Constitution of the United States.

THIS is an equity suit begun in the Supreme Court of the District of Columbia by Edwin T. Morris and nine other persons, all averred to be citizens of the United States and not Indians, against Ethan A. Hitchcock, as Secretary of the Department of the Interior, William A. Jones, as Commissioner of Indian Affairs, J. George Wright, as Indian inspector, and J. Blair Shoenfelt, as United States Indian agent, resident at the city of Muscogee, in the Indian Territory. Certain of the complainants were averred to be residents either of the State of Texas or of the State of Missouri, and others were averred to be residents of the Indian Territory.

It was alleged that each complainant was the owner in his own right of not less than five hundred head of cattle and horses, of the value of not less than fifteen dollars per head, which were grazing upon land in the Chickasaw Nation, Indian Territory, under contracts with individual members of said tribe, holding such lands as their approximate shares

upon allotments to be made. The purpose of the suit was to obtain a decree perpetually enjoining said defendants from seizing, molesting or removing the cattle and horses of plaintiffs from the Indian Territory, as it was averred they threatened to do under the pretended authority of an act of the legislature of the Cherokee Nation and regulations promulgated by the Secretary of the Interior, which were averred to be repugnant to the Fourth and Fifth Amendments to the Constitution of the United States. The statute and regulations referred to are copied in the margin.[1]

---

[1] *Regulations (June 3, 1902,) Governing the Introduction by Non-citizens of Live Stock in the Chickasaw Nation, Indian Territory.*

Section 29 of the act of Congress, approved June 28, 1898, 30 Stat. 495, ratifying the agreement with the Choctaw and Chickasaw Nations, Indian Territory, provides in part as follows:

"It is further agreed that no act, ordinance or resolution of the council of either the Choctaw or Chickasaw tribes, in any manner affecting the land of the tribe, or of the individuals, after allotment, or the moneys or other property of the tribe or citizens thereof (except appropriations for the regular and necessary expenses of the government of the respective tribes,) or the rights of any persons to employ any kind of labor; or the rights of any persons who have taken or may take the oath of allegiance to the United States, shall be of any validity until approved by the President of the United States. When such acts, ordinances or resolutions, passed by the councils of either of said tribes, shall be approved by the governor thereof, then it shall be the duty of the national secretary of said tribe to forward them to the President of the United States, duly certified and sealed, who shall, within thirty days after their reception, approve or disapprove the same—said acts, ordinances or resolutions, when so approved, shall be published in at least two newspapers having a *bona fide* circulation in the tribe to be affected thereby, and when disapproved shall be returned to the tribe enacting the same.

"It is further agreed, in view of the modification of legislative authority and judicial jurisdiction herein provided, and the necessity of the continuance of the tribal governments so modified, in order to carry out the requirements of this agreement, that the same shall continue for a period of eight years from the fourth day of March, eighteen hundred and ninety-eight."

Under these provisions, the following act of the Chickasaw national council, approved by the governor on May 3, 1902, was approved by the President of the United States on May 15, 1902, and entitled:

The bill of complaint was demurred to upon the grounds following: (a) Want of jurisdiction in equity because of ade-

---

An act to prescribe privilege or permit taxes and defining the manner of their collection.

Be it enacted by the legislature of the Chickasaw Nation:

SEC. 1. That there shall be paid upon live stock owned or held by non-citizens within the limits of the Chickasaw Nation, an annual privilege or permit tax as follows: On cattle, horses and mules, twenty-five cents per head; and on sheep and goats, five cents per head: *Provided,* That there shall be exempted from the provisions of this act, when owned and used by the head of a family, two cows and calves, and one team, consisting of two horses or two mules, or one horse and one mule; and the provisions of this act shall also apply to all live stock introduced into the Chickasaw Nation since January 1, 1902, upon which the tribal taxes imposed by the laws of the Chickasaw Nation have not been paid, with like force and effect as if such cattle had been owned and held within the limits of Chickasaw Nation for one year prior to the passage and approval of this act.

SEC. 2. That such privilege or permit taxes shall hereafter be payable to such person or persons and collected under such rules and regulations as may be prescribed by the Secretary of the Interior.

SEC. 3. That the expenses of collecting such privilege or permit taxes shall be deducted from the gross collections, and the balance paid quarterly into the treasury of the Chickasaw Nation.

SEC. 4. That such privilege or permit taxes shall be due and payable annually, upon demand, and if such taxes are not paid when demanded, the live stock upon which such taxes are due shall be held to be in the Chickasaw Nation without its consent, and unlawfully upon the lands of the Chickasaws, and the presence of such live stock, and owners or holders thereof, within the limits of said nation, shall be deemed detrimental to the peace and welfare of the Chickasaw Indians.

SEC. 5. That all acts or parts of acts in conflict herewith, be and the same are, hereby repealed; and this act shall take effect from and after its approval by the President of the United States.

In pursuance of the above and foregoing the following regulations are promulgated:

*Regulations Prescribed by the Secretary of the Interior Governing the Introduction or Holding of Live Stock in the Chickasaw Nation by Non-citizens.*

SEC. 1. Any person, other than a recognized citizen of the Choctaw or Chickasaw Nations, desiring to introduce or hold stock of any description within the limits of the Chickasaw Nation, Indian Territory, shall first make application to the United States Indian inspector for the Indian Territory, Muscogee, Indian Territory, and shall pay to the United States Indian agent, Union agency, an annual tax of twenty-five (25) cents per head on all cattle, horses and mules, and on all sheep and goats five (5) cents per

quate right to relief at law; (*b*) Defect of necessary parties in that neither the Chickasaw Nation or tribe,· or any mem-

---

head, .provided that there shall be exempted from the. provisions of these regulations, when owned and used by the head of a family,· two cows and' calves, and one team of horses, or two mules, or one horse and one mule.

SEC. 2. Such tax shall be paid January 1st of each year, or prior to the time of the introduction of such stock, and accompanying such remittance there shall be ·furnished, under oath, a full description of such˙ stock, including the number and brands, together with any other desired information.

SEC. 3. Such taxes shall apply to all stock introduced within the limits of the Chickasaw Nation since January 1, 1902, upon which taxes have not already been paid to the Chickasaw Nation and for which the owners or holders cannot˙produce receipts.

SEC. 4. The tax prescribed shall be paid annually in advance, whether such stock is held. the entire succeeding twelve months or for a portion of. such time. ·

SEC. 5. Where cattle are held by a citizen and mortgaged to a non-citizen, not in good faith but for the purpose of evading the payment of taxes, said cattle shall be considered ·as owned or held by such non-citizen, and subject to these regulations and taxes.

SEC. 6. Parties who now hold stock within the limits· of the Chickasaw Nation should remit the taxes prescribed promptly to the U. S. Indian agent at Muscogee, Indian Territory, and such payments must be made within ten (10) days from the date of receiving notice of these regulations. If such taxes are not paid within this time remittances made thereafter .will not be accepted, but such stock and any other stock found within the limits of the Chickasaw Nation after July 1, 1902, upon which taxes have not been paid, will be considered as being within the limits of the Chickasaw Nation unlawfully, and measures will be adopted looking to the. removal by the United States Indian agent of such stock, together with the owners of holders thereof, without further notice.

SEC. 7. Authorized agents of the Interior Department will make necessary investigations and reports and see that proper remittances. are forwarded, acting under the direction of the United States Indian inspector for Indian Territory, but will not be authorized to receive or collect any taxes whatsoever, as all payments must be made direct to the United States · Indian agent, who will furnish receipts for all payments made.

SEC. 8. These regulations and taxes will apply to all stock as indicated, held within the limits of the Chickasaw Nation by other than recognized citizens of ·the Choctaw or Chickasaw Nations, whether held upon the public domain or upon lands leased from individual Indians.

THOS. .RYAN, *Acting Secretary.*

Department of the Interior, Washington, D. C.

Approved· June 3, 1902.

ber or representative thereof, was joined as a defendant; and
(c) Want of equity.

. After argument, the court overruled the first and second
grounds of demurrer, and sustained the third ground. The
complainants elected to stand upon their bill of complaint
and a decree was consequently entered dismissing the bill.
On appeal, the decree was affirmed by the Court of Appeals
of the District of Columbia. 21 App. D. C. 565. The cause
was then brought to this court. -

*Mr. Jackson H. Ralston, Mr. Frederick L. Siddons* and *Messrs.
Davis & Garnett* for appellants.

*Mr. Assistant Attorney General Campbell* and *Mr. Assistant
Attorney A. C. Campbell* for appellees.

MR. JUSTICE WHITE, after making the foregoing statement,
delivered the opinion of the court.

We think the court below was right in holding that the first
and second grounds of demurrer were not well taken, but do
not think it necessary to review the subject, as the opinion
which we have reached on the merits of the case will dispose
of the entire controversy.

The act of Congress approved June 28, 1898, commonly
known as the Curtis Act, 30 Stat. 495, c. 517, under which
the act of the Chickasaw Nation and regulations of the Sec-
retary of the Interior which are assailed were adopted, is enti-
tled "An act for the protection of the people of the Indian
Territory, and for other purposes." The question of the va-
lidity and construction of that act was under consideration in
*Stephens* v. *Cherokee Nation,* 174 U. S. 445, and *Cherokee Nation*
v. *Hitchcock,* 187 U. S. 294, and in view of the rulings in those
cases the constitutionality of the statute is not now open to
question.

While it is unquestioned that by the Constitution of the
United States Congress is vested with paramount power to

regulate commerce with the Indian tribes, yet it is also undoubted that in treaties entered into with the Chickasaw Nation, the right of that tribe to control the presence within the territory assigned to it of persons who might otherwise be regarded as intruders has been sanctioned, and the duty of the United States to protect the Indians " from aggression by other Indians and white persons, not subject to their jurisdiction and laws," has also been recognized. Arts. 7 and 14, Treaty June 22, 1855, 11 Stat. 611 ; Art. 8, Treaty April 28, 1866, 14 Stat. 769. And it is not disputed that under the authority of these treaties the Chickasaw Nation has exercised the power to attach conditions to the presence within its borders of persons who might otherwise not be entitled to remain within the tribal territory.

Legislation of the same general character as that embodied in the act of the legislature of the Chickasaw Nation here assailed as invalid had been enacted by the Chickasaw Nation before the passage of the Curtis Act. The essential provisions of one such law, passed on October 17, 1876, were recited in a report made to the Senate by the Committee on the Judiciary, on February 3, 1879, from which we copy the following:

" The law in question seems to have a twofold object—to prevent the intrusion of unauthorized persons into the territory of the Chickasaw Nation, and to raise revenue. By its terms no citizen of any State or Territory of the United States can either rent land or procure employment in the Chickasaw country without entering into a contract with a Chickasaw, which contract the latter is to report to the clerk of the county where he resides, and a permit must be obtained for a time not longer than twelve months, for which the citizen is to pay the sum of $25.

" Every licensed merchant, trader, and every physician, not a Chickasaw, is required to obtain a permit, for which the sum of $25 is exacted."

Declaring in substance that under the existing treaties with the tribe, the Chickasaws were not prohibited from excluding

from the territory of the nation the persons affected by the act, the committee expressed the opinion that the act which was the subject of the report was not invalid.

Again, on December 14, 1898, the legislature of the Chickasaw Nation passed an act, which in section 2, with some exemptions mentioned in a proviso, imposed the following permit taxes:

"SEC. 2. That any non-citizen who owns horses, jacks, jennets, mules, or other cattle, and who holds them upon the public domain or within the Chickasaw Nation, shall be required to pay an annual permit tax of twenty-five cents per head for each horse, jack or jennet, mule, or bovine, and five cents per head for each sheep and goat so held within this nation."

By the ninth section of the same act it was provided as follows:

"SEC. 9. That any non-citizen, subject to a permit tax under the provisions of section one of this act, and who shall refuse to pay his permit tax, after due notice for thirty days, shall be deemed an intruder by virtue of the intercourse law of the United States of America and subject to removal; and such intruder shall be reported to the United States Indian agent (or inspector) to the Five Civilized Tribes, and shall forthwith be removed from the Chickasaw Nation, under the direction of the said United States Indian agent or inspector."

The agreement made by the commission to the Five Civilized Tribes with the commissions representing the Choctaw and Chickasaw tribes of Indians on April 23, 1897, as amended by the Curtis Act, was in section 29 of that act ratified and confirmed and made operative on December 1, 1898.

By that agreement certain modifications, not material to be stated, were made in the legislative authority and judicial jurisdiction of the tribal governments, and, so modified, the tribal governments were continued in force, and are to so continue until March 4, 1906. One of the clauses of the agreement reads as follows:

" It is further agreed that no act, ordinance or resolution of the council of either the Choctaw or Chickasaw tribes, in any manner affecting the land of the tribe, or of the individuals, after allotment, or the moneys or other property of the tribe or citizens thereof, (except appropriations for the regular and necessary expenses of the government of the respective tribes,) or the right of any persons to employ any kind of labor, or the rights of any persons who have taken or may take the oath of allegiance to the United States, shall be of any validity until approved by the President of the United States. When such acts, ordinances, or resolutions passed by the council of either of said tribes shall be approved by the governor thereof, then it shall be the duty of the national secretary of said tribe to forward them to the President of the United States, duly certified and sealed, who shall, within thirty days after their reception, approve or disapprove the same. Said acts, ordinances, or resolutions, when so approved, shall be published in at least two newspapers having a *bona fide* circulation in the tribe to be affected thereby, and when disapproved shall be returned to the tribe enacting the same."

On September 17, 1900, and September 21, 1901, the proper construction of the Curtis Act was considered, at the request of the Secretary of the Interior, in opinions of Attorney General Griggs and Attorney General Knox respectively. In the first of those opinions it was in substance held as follows:

"Under the treaties with the Five Civilized Tribes of Indians no person not a citizen or member of a tribe, or belonging to the exempted classes, can be lawfully within the limits of the country occupied by these tribes without their permission, and they have the right to impose the terms upon which such permission will be granted.

" The provisions of the act of June 28, 1898, 30 Stat. 495, for the organization of cities and towns in said Indian country and the extinguishment of Indian title therein have not yet been consummated, and it is still Indian country. This

act does not deprive these Indians of the power to enact laws with regard to licenses or taxes, nor exempt purchasers of town or city lots from the operation of such legislation.

"Purchasers of lots do so with notice of existing Indian treaties and with full knowledge that they can only occupy them by permission from the Indians. Such lands are sold under the assumption that the purchasers will comply with the local laws.

"Sections 2147 to 2150, inclusive, of the Revised Statutes, expressly confer the right to use the military forces of the United States in ejecting trespassers upon Indian lands, and the grant of this power carries with it the duty of its exercise.

"It is the duty of the Department of the Interior to remove all classes forbidden by treaty or law who are within the domain of the Five Civilized Tribes without Indian permission; to close all businesses which require permit or license and are being conducted without the same; and to remove all cattle which are being pastured on said land without Indian permit or license."

And in the last-mentioned opinion it was in substance declared that, under section 16 of the Curtis Act, the Secretary of the Interior had authority to collect a tribal tax imposed by the laws of the Cherokee Nation of Indians upon the exportation of prairie hay from that nation, and that the tax was just as applicable to hay raised upon lands occupied by individual members of the nation as their share of the public domain, pending allotments, as in any other case, and would be so even if the shipper was the absolute owner of the land on which the hay was raised.

Since the rendition of these opinions of the legal advisers of the Government, Congress has created an express exception in favor of owners of town lots, prohibiting their being proceeded against as intruders, but has not legislated against the enforcement of the legislation now under review, which was then operative. Thus, on May 27, 1902, in the Indian Appropriation Act, 32 Stat. 259, c. 858, it was provided "That it shall

be hereafter unlawful to remove or deport any person from the Indian Territory who is in lawful possession of any lots or parcels of land in any town or city in the Indian Territory which has been designated as a townsite under existing laws and treaties, and no part of this appropriation shall be used for the deportation or removal of any such person from Indian Territory."

Viewing the Curtis Act in the light of the previous decisions of this court and the dealings between the Chickasaws and the United States, we are of opinion that one of the objects occasioning the adoption of that act by Congress, having in view the peace and welfare of the Chickasaws, was to permit the continued exercise, by the legislative body of the tribe, of such a power as is here complained of, subject to a veto power in the President over such legislation as a preventive of arbitrary and injudicious action.

The refusal to pay the permit tax in question caused the cattle and horses of the complainants to be wrongfully within the Territory, and we cannot decline to recognize such fact because of the hardships which it is alleged must arise if the act and regulations are enforced. Being of opinion that the regulations of the Secretary of the Interior are valid, and that the act of the legislature of the Chickasaw Nation approved by the governor on May 5, 1902, and sanctioned by the President of the United States on May 15, 1902, was not the exercise of arbitrary power as claimed, and that neither the act nor the regulations in any respect violate the Constitution of the United States, it follows that the judgment below is correct, and it must, therefore, be

*Affirmed.*