OPINION
GARY P. SULLIVAN, Chief Justice.

BRIEF FACTUAL OVERVIEW AND PROCEDURAL HISTORY

Pursuant to the Fort Peck Comprehensive Code of Justice, Title XII, § 208[1], a *174 procedure exists to ‘cross deputize’ certain Montana law enforcement officers with authority to detain and arrest Indians on the Fort Peck Indian Reservation. The procedure requires that the Montana law enforcement agency submit the name of the officer to the Tribal Executive Board for a resolution approving that particular officer.
On November 22,1997, Roosevelt County Sheriff Deputies Chad Hilde and Gina Davis were two of several law enforcement officers who, according to plaintiffs complaint, detained plaintiff minor, Colan Lil-ley[2] and several of his friends and relatives. Apparently the officers had stopped to check a vehicle parked on the “old dump ground road”. During the detention Co-lan was allegedly searched inappropriately by officer Davis while inside a police vehicle parked on the side of the road. The “old dump ground road” is a county road which is maintained by Roosevelt county. The right-of-way was established for Roosevelt County to cross fee land owned by Bertha and Leroy Shultz, and Larry Olson. It is not clear exactly where the alleged incident occurred, however, for the purpose of this opinion, we assume that the alleged incident took place on alienated, non-Indian land.
A complaint was filed with the Tribal Court on April 23, 1997, cause no. 97^4-092, alleging assault, and deprivation of civil rights under 42 USC § 1983. A motion to dismiss pursuant to F.R. Civ P. Rule 12b for lack of subject matter jurisdiction was filed by the defendants on May 20,1997, relying heavily on the Eighth Circuit Court of Appeals’ decision in A-1 Contractors v. Strate (1996) 76 F.3d 930. The Eight Circuit’s opinion was later affirmed by the United States Supreme Court in Strate v. A-1 Contractors (1997) 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661.
Chief Judge Stafne denied the motion on November 5, 1997 basing his decision on the second exception in Montana, v. United States (1981) 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493. The defendants filed a timely appeal. Oral argument was heard July 30, 1999 and the matter was submitted.

ISSUE PRESENTED

Defendants contend that the Tribal Court lacks subject matter jurisdiction over non-Indians whose alleged tortious conduct took place on non-Indian, alienated land, lying within the exterior boundaries of the Fort Peck Indian Reservation. They cite error in the Tribal Court’s denial of their Motion to Dismiss, urging that neither of the two Montana exceptions apply to the facts in this case.

STANDARD OF REVIEW

“The jurisdiction of the Court of Appeals shall extend to all appeals from final orders and judgment of the Tribal Court. The Court of Appeals shall review de novo all determinations of the Tribal Court on matters of law, but shall not set aside any factual determinations of the Tribal Court if such determinations are supported by substantial evidence”. Title I Ft Peck CCOJ Section 201.
Whether our Tribal Court has subject matter jurisdiction is obviously a ques *175 tion of law, thus we review the matter de novo.

DISCUSSION

As previously noted, the defendants contend that the Tribal Court lacks subject matter jurisdiction based largely on Strate. In Strate, a non-Indian widow, residing[3] on the Fort Berthold Reservation, was seriously injured in a vehicular accident on a North Dakota highway which runs for 6.59 miles through the Three Affiliated Tribes’ Reservation. North Dakota maintained the highway pursuant to a federal grant for that purpose. The other vehicle was owned by A-l Contractors, which was based off the Reservation and which had contracted with a wholly owned subsidiary of the Three Affiliated Tribes for landscaping work on the Reservation. The A-l vehicle was driven by Stockert, an A-l employee, who lived off the Reservation. The Supreme Court held that the Tribal Court lacked jurisdiction when a non-Indian plaintiff sues a non-Indian defendant for injuries sustained in an accident which occurred on non-Indian, alienated land, even though the accident took place within the exterior boundaries of the Reservation.
Stating that Montana provided the general rule, the Court went on to say.
“Montana thus described a general rule that, absent a different congressional direction, Indian tribes lack civil authority over the conduct of nonmembers on non-Indian land within a reservation, subject to two exceptions: The first exception relates to nonmembers who enter consensual relationships with the tribe or its members; the second concerns activity that directly affects the tribe’s political integi'ity, economic security, health, or welfare. The Montana Court recognized that the Crow Tribe retained power to limit or forbid hunting or fishing by nonmembers on land still owned by or held in trust for the Tribe. Id., at 557[ 101 S.Ct. 1245], The Court held, however, that the Tribe lacked authority to regulate hunting and fishing by non-Indians on land within the Tribe’s reservation owned in fee simple by non-Indians. Id., at 564-567[ 101 S.Ct. 1245].” Id. at pp. 446—447, 117 S.Ct. 1404
In applying these two exceptions in Montana to the facts in Strate, the Court stated:
“The first exception to the Montana rule covers ‘activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.’ 450 U.S. at 565[ 101 S.Ct. 1245]. The tortious conduct alleged in Fredericks’ complaint does not fit that description. The dispute, as the Court of Appeals said, is “distinctly non-tribal in nature.” 76 F.3d at 940. It ‘arose between two non-Indians involved in [a] run-of-the-mill [highway] accident.’ Ibid. Although A-l was engaged in subcontract work on the Fort Berthold Reservation, and therefore had a “consensual relationship” with the Tribes, “Gisela Fredericks was not a party to the subcontract, and the Tribes were strangers to the accident.” Ibid, Montana’s list of cases fitting within the first exception, see 450 U.S. at 565-566,[ 101 S.Ct. 1245] indicates the type of activities the Court had in mind: Williams v. Lee, 358 U.S. 217, 223, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959) (declaring tribal jurisdiction exclusive over lawsuit arising out of on- *176 reservation sales transaction between nonmember plaintiff and member defendants); Morris v. Hitchcock, 194 U.S. 384, 24 S.Ct. 712, 48 L.Ed. 1030 (1904) (upholding tribal permit tax on nonmember-owned livestock within boundaries of the Chickasaw Nation); Buster v. Wright, 135 F. 947, 950 (C.A.8 1905) (upholding Tribe’s permit tax on nonmembers for the privilege of conducting business within Tribe’s borders; court characterized as “inherent” the Tribe’s “authority ... to prescribe the terms upon which noncitizens may transact business within its borders”); Colville, 447 U.S. at 152—154 [100 S.Ct. 2069] (tribal authority to tax on-reservation cigarette sales to nonmembers “is a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law or necessary implication of their dependent status”). Measured against these cases, the Fredericks-Stockeit highway accident presents no “consensual relationship” of the qualifying kind.” Id. at pp. 456-157, 117 S.Ct. 1404
Essentially, the Strate Court, affirming the Eight Circuit Court of Appeals’ earlier decision, stated that although A-l was doing landscaping work on the Fort Berthold reservation and thus, had a consensual relationship with the Tribe, the plaintiff was not a party to the contract and the Tribe were ‘strangers to the accident’. The facts in our case are quite distinguishable from those of Strate.
All of the defendants are employed by the Roosevelt County Sheriffs office. Defendant Grainger is the Sheriff and defendants Hilde and Davis are deputies. At the time of the subject incident, and continuing to the present time, an agreement exists pursuant to Title XII, § 208, between Roosevelt County and the Fort Peck Tribes, wherein the law enforcement officers of Roosevelt County are “cross-deputized”. The enabling Fort Peck Tribal code provision requires affirmative action on the part of Roosevelt County. When the County acts upon this code provision, the relationship then becomes an agreement between the two parties. This agreement of “cross deputization” ameliorates the difficulties encountered by law enforcement officers who must deal with multiple adjacent jurisdictional issues and the complexities they encounter when federal, state, local and Tribal law converge. Procedurally, each of the names of Roosevelt County’s law enforcement officers are individually submitted to the Fort Peck Tribal Executive Board, and pursuant to the agreement, a resolution is then passed granting those officers authority to arrest members of the Fort Peck Tribes for violations of federal, state and local laws within the boundaries of the Fort Peck Reservation. Thus, each of these law enforcement officers become authorized agents of the Fort Peck Tribes for the purpose of law enforcement.
Thus, in applying Montana’s first exception to the facts in our case, it is clear that the dispute involves an Indian plaintiff, who is not a party to the agreement, but by his very appearance on the Fort Peck Reservation, is a subject to be either protected or pursued by the parties to the agreement[4]. The defendants in this dispute are at the very least, authorized agents of both of the principals to the agreement. Finally, the Fort Peck Tribes are certainly no stranger to the incident herein, which could, inter alia, ultimately require their appearance in a Court of Law under the doctrine of respondent superior.
*177 Thus, we find that the first exception in Moidana, is applicable to this case. Although our analysis could end here, we continue to the second exception due to the important nature of this case.
Our Tribal Court held that the second exception in Montana, was applicable:
“.. . 2. Police activity over the Indians on the Fort Peck Indian Reservation affects the political integrity of the Tribes and potentially the health and welfare of the Tribes. Consequently, such alleged police activity satisfies the second exception in Montana, ... (citation omitted), giving the Fort Peck Tribal Court jurisdiction of this matter, (at II. 11-16, p. 2, Court Order Denying Defendants’ Motion to Dismiss dated. November 5, 1997)
We agree, while at the same time, we are also mindful of the narrow construction given to this exception by the Strate court:
“The second exception to Montana’s general rule concerns conduct that ‘threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.’ 450 U.S. at 566 [101 S.Ct. 1245], Undoubtedly, those who drive carelessly on a public highway running through a reservation endanger all in the vicinity, and surely jeopardize the safety of tribal members. But if Montana’s second exception requires no more, the exception would severely shrink the rule.” Id. at pp. 457-458, 117 S.Ct. 1404
Nonetheless, we find that our facts make a three point landing on this exception:
1. The political integrity of the Tribes would be seriously diminished if it had no control over the conduct of its agents. This is particularly so when those agents are given the awesome responsibility of enforcing the laws of the land. It would be difficult to imagine a worse dichotomy than the severance of authority of the Tribes from its authorized law enforcement officers. Equally compelling is the fact that without adjudicative jurisdiction in this matter, those members of the Fort Peck Tribes who have been injured at the hands of those commissioned by their own government, could not seek proper redress within their own Court system. Such a result would be an anathema to any governing body.
2. The economic security of the Tribes is seriously jeopardized by the threatened liability arising from the tortious conduct of its authorized agents[5]. Even more egregious if such conduct could be alleged to have been condoned by the Tribes[6]. Without adjudicative jurisdiction, the Tribal Government, facing this kind of impending liability, would be forced to answer in a foreign court for damages to compensate one of its own members for an incident occurring within the exterior boundaries of its own reservation, which was occasioned by one of its own authorized agents. In our view, it would seem reasonable to assume that if the Strate court found it necessary to protect A-l and their employee, Stockert, from answering in a ‘foreign court’, then it would also feel compelled to similarly protect the Fort Peck Tribal government under the facts herein stated[7].
*178 3. The health and welfare of the tribe is obviously put at serious risk when those who are empowered by the governing authorities to enforce the laws of the land, instead, choose to violate basic rights of the citizenry and visit tortious conduct upon those whom they are charged to protect. Each and every member of the Tribes, as well as each and every individual who is within the exterior boundaries of the Tribes, are placed at, and subject to, such risk. It has been said that the primary purpose for the existence of any government is protection of its people. We agree with this proposition and find that such protection simply could not be given under the facts herein, without the adjudicative jurisdiction sought by the plaintiff.
Finally, we cannot help but note the alarming rise in cases on our docket which are invoking the Straie doctrine. It has become the ‘get out of jail free’ card for those who would flee from our Tribal Courts; it is thought to be a veritable jurisdictional panacea. For a Court to be jealous of its jurisdiction is not original with our Tribal Court, nor is it unique. Every court of which we have knowledge, jealously holds to its jurisdiction.
While we do not fault any defendant who wishes to exercise whatever rights they might have, we do see ominous dark legal clouds gathering and perhaps a monstrous storm brewing for our Tribal government, if this doctrine is interpreted in a ‘lockstep’ fashion or, if it is expanded beyond the facts in Strate.
We are reminded of the words of Justice Cardozo, wilting for the New York Court of Appeals in Hynes v. N.Y. Railroad (1921) 231 N.Y. 229, 131 N.E. 898, wherein a 16 year old boy was electrocuted by electrical wiring owned and operated by the New York railroad, when he dove into a public waterway and a great controversy arose over whether the railroad was liable. While the argument raged as to the status of the diving board and the exact location of the boy’s feet immediately prior to his fatal dive, Justice Cardozo had this to say:
“This case is a striking instance of the dangers of ‘a jurisprudence of conceptions’ {Pound, Mechanical Jurisprudence, 8 Columbia Law Review, 605, 608, 610), the extension of a maxim or a definition with relentless disregard of consequences to a “a dryly logical extreme.” The approximate and relative become the definite and absolute. Landowners are not bound to regulate their conduct in contemplation of the presence of trespassers intruding upon private structures. Landowners are bound to regulate their conduct in contemplation of the presence of travelers upon the adjacent public ways. There are times when there is little trouble in marking off the field of exemption and immunity from that of liability and duty. Here structures and ways are so united and commingled, superimposed upon each other, that the fields are brought together. In such circumstances, there is little help in pursuing general maxims to ultimate conclusions. They have been framed alio intuitu. They must be reformulated and readapted to meet exceptional conditions.” (Id. at pp. 235-236, 131 N.E. 898)
In more simplistic terms, we believe that Justice Cardozo, was convinced that, if liability hinged upon whether young Harvey Hynes had one foot on a horizontal diving board attached to land owned by the N.Y. R.R., thus making him a trespasser, or whether his foot was positioned in ‘the same airspace’ but on a vertical board which was grounded in the public water *179 way, then surely the result would be more of a patent absurdity than a reasoned conclusion. Such mechanical approaches to liability, without due regard to the consequences, renders the truth seeker, not only blind, but deaf and dumb as well.
With the ever growing ‘patchwork quilt’ geographical configurations in Indian Country, the Strate doctrine will no doubt present difficult challenges for our Tribal Government. And yet it is this Court’s solemn duty to cling with religious fervor to the prevailing tenets and precedents of law, such as Strate, to which we are sworn to uphold. Nonetheless, we candidly and wholeheartedly endorse Justice Cardozo’s admonition regarding the adoption of ‘a jurisprudence of conceptions’. We believe grave danger exists in any ‘relentless disregard of consequences’, even if it is done in the noble pursuit of ‘adhering to the law’. We further believe that such pursuit is tantamount to entrusting a just outcome to the vagaries of a judicial system based on the legal equivalent of ‘Russian roulette’. Along that road we choose not to travel.
We affirm the Tribal Court’s finding that the second exception in Montana also applies to the facts herein. Accordingly, the Order Denying Defendant’s Motion to Dismiss is affirmed.
CONCUR: GARY M. BEAUDRY, Associate Justice, and CARROLL J. DeCOTEAU, Associate Justice.

. Sec. 208. State and local law enforcement officials authorized to make arrests.
(a) All law enforcement officials vested with general law enforcement authority by the State of Montana, or by any County or City within the boundaries of the Fort Peck Reservation and approved by Executive Board on recommendation of the safety committee, are hereby authorized to arrest Indians on any highway on the Reservation or within the boundaries of the cities of the Reservation for violations of the Tribal Code of Justice. Each jurisdiction shall from time to time submit the names of new law enforcement officials to the safely committee for approval.
(b) Upon arresting any Indian as authorized by this Section, such law enforcement *174 officials shall promptly deliver the individual to the Tribal Court or to the appropriate tribal law enforcement officers for action under tribal laws.

. The record is not clear as to Colan’s status. He is referred to as a member of the Fort Peck Tribes and also referred to as an “Indi-an”. Clarification as to his status with the Fort Peck Tribes is not necessary for the purposes of this opinion.

. There was apparently a factual dispute as to whether Gisela Fredericks, the plaintiff in Strate was actually residing on the Fort Bert-hold reservation at the time of the accident. The U.S. Supreme Court held that her residence at the time of the accident was immaterial.

. In the nature of a ‘third party beneficiary'.

. We are keenly aware of the general immunity that the Fort Peck Tribes enjoy. Suffice it to say that such immunity is not legally ‘bullet-proof.

. To elicit the truth of this statement, one needs only to take notice of the fact that the great city of Los Angeles laces financial disaster in the face of hundreds of millions of dollars in pending lawsuits for alleged misconduct of its law enforcement officers.

.We are acutely aware that the Fort Peck Tribes are not a party to this litigation. We are simply illustrating how, under the actual *178 facts in this case, the economic security of the Fort Peck Tribes could be placed at risk.