BIG HORN COUNTY ELECTRIC COOPERATIVE, INC., Plaintiff–Appellee,

v.

Denis ADAMS, Tax Commissioner of the Crow Tribe of Indians; Steven Stevens, and unknown members of the Crow Public Utility Commission; Ron Arneson, Honorable; Glen Birdinground, Honorable, Defendants–Appellants.

No. 99–35799.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 8, 2000

Filed July 14, 2000

John Fredericks, III, Fredericks, Pelcyger & Hester, Louisville, Colorado; Majel Russell, Crow Tribe of Indians, Billings, Montana, for the defendants-appellants.

James E. Torske, Hardin, Montana, for the plaintiff-appellee.

Jerilyn Decoteau, Indian Law Clinic, University of Colorado School of Law, Boulder, Colorado, for amicus Blackfeet, Tribe, Walker River Paiute Tribe, Confederated Tribes of the Umatilla Indian Reservation, and Pryamid Lake Paiute Tribe.

Michael Geiermann, Rolfson Schulz Lervick & Geiermann, Bismarck, North Dakota, for amicus Reservation Telephone Cooperative.

Elizabeth Ann Peterson, Ethan G. Shenkman, United States Department of Justice, Environment and Natural Resources Division, Washington, DC; Elizabeth Rodke, Office of the Solicitor, United States Department of Interior, Washington, DC, for amicus United States of America.

Michael E. Webster, Crowley, Haughey, Hanson, Toole & Dietrich, Billings, Montana, for amicus Interstate Natural Gas Association of America.

Reid Peyton Chambers, Arthur Lazarus, Jr., Colin C. Hampson, Sonosky, Chambers, Sachse & Endreson, Washington, DC, for amicus Assiniboine and Sioux Tribes of the Fort Peek Reservation.

Luralene D. Tapahe, Navajo Nation Department of Justice, Window Rock, Navajo Nation, Arizona, for amicus Navajo Nation.

Before: HUG, Chief Judge, GOODWIN, and BRUNETTI, Circuit Judges.

BRUNETTI, Circuit Judge:

The Crow Tribe ("Tribe") enacted the Railroad and Utility Tax Code ("RUTC"), which assesses a 3% tax on the full fair market value of all "utility property" located on tribal or trust lands within the exterior boundaries of the Crow Reservation ("Reservation"). Big Horn Electric Cooperative ("Big Horn") filed an action in federal district court against several tribal officials for injunctive and declaratory relief, contending that the Tribe exceeded its regulatory jurisdiction in placing an ad valorem tax on the value of Big Horn's utility property. The tribal officials appeal the district court's grant of summary judgment to Big Horn. They argue that the Tribe's inherent sovereign authority justifies the imposition of the tax. We have jurisdiction under 28 U.S.C. § 1291, and we affirm in part and reverse in part.

I.

The Reservation, located in Southern Montana, was established by the 1868 Treaty of Fort Laramie ("Treaty") between the Tribe and the United States. *See* Second Treaty of Fort Laramie, May 7, 1868, 15 Stat. 649 (1868). Although the Treaty originally granted the Tribe 8 million acres of land, *see id.,* several subse-

quent Acts of Congress reduced the total area of the Reservation to slightly under 2.3 million acres. *See Montana v. United States,* 450 U.S. 544, 548, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). There is a check-erboard pattern of land ownership on the Reservation composed of fee land owned by non-Indians and members of the Tribe and trust land held by the United States in trust for the Tribe. *See* The Indian General Allotment Act of 1887, Feb. 8, 1887, 24 Stat. 388; Crow Allotment Act of 1920, 41 Stat. 751; *see also Montana,* 450 U.S. at 548, 101 S.Ct. 1245 (discussing the apportionment of land on the Crow Reservation).

In 1993, the Crow Tribal Council adopted a resolution authorizing the implementation of RUTC, which assesses a 3% tax on the full fair market value of all "utility property" located on tribal or trust lands within the exterior boundaries of the Reservation. According to § 202(H) of RUTC, the term "utility property" includes:

> all property used for utility purposes under an agreement conferring rights to use or possess trust land on the reservation other than an agreement transferring full title or full beneficial title, including, but not limited to, a lease, right of way, use permit or joint venture … [and] all improvements placed on trust land on the reservation pursuant to such an agreement.

The Tribe's tax commissioner calculates the ad valorem tax by applying a formula created by RUTC. The starting point is to ascertain the full market value of a taxpayer's utility property as determined by the State of Montana or a qualified appraiser. To determine the total value of taxable property located on the Reservation, the tax commissioner then multiplies the full market value of all utility property owned by a taxpayer by a ratio of total miles of line system located on the Reservation to total miles of line system wide. In the final step, the tax commissioner assesses the 3% tax on the calculated market value of utility property located on the Reservation.

Section 219 of RUTC prohibits a taxpayer from passing the utility tax through to Crow customers and requires a taxpayer to treat the tax as "an imbedded cost or revenue requirement." Any attempt to charge Crow customers a higher fee due to the utility tax is deemed discriminatory under RUTC and allows the tribal court to enjoin the taxpayer from charging that fee and further provides for a discretionary award of attorney's fees, costs, and treble damages to any consumer (or the Tribe) successfully challenging the levy.

The present action arose out of the Tribe's application of the utility tax to Big Horn, an electric cooperative that provides utility service to members located in Montana and Northern Wyoming. Big Horn is the primary provider of retail electrical services on the Crow Reservation, serving more than 1,700 customers within the Reservation's boundaries. The Tribe and its members constitute approximately half of Big Horn's total membership. The rights-of-way for Big Horn's transmission and distribution systems across Indian land were granted by the Secretary of the Interior with the consent of the Tribe pursuant to 25 U.S.C. §§ 323–28.

In December 1993, the Tribe sent Big Horn its first tax bill in the amount of $36,699. Beginning in April 1994, Big Horn began passing the utility tax through to Crow customers in violation of § 219 of RUTC. The tax was passed-through based on each customer's pro rata share of Big Horn's total kilowatt-hour usage in the previous year. Every Big Horn billing statement included a separate itemized charge labeled "Crow Utility Tax," representing each customer's pro rata share of the utility tax.

Shortly thereafter, the Tribe initiated an action in tribal court to enjoin Big Horn from passing the utility tax through to Crow customers. Big Horn counterclaimed, alleging that the Tribe exceeded

its regulatory jurisdiction in taxing property located on non-Indian fee land and also challenging the legality of § 219 of RUTC. The Tribe was granted summary judgment and the tribal court issued a permanent injunction to prevent any further pass-through of the utility tax. The tribal court also dismissed Big Horn's counterclaims, finding that they presented "no case or controversy" because the record indicated that the Tribe had never attempted to tax property located on non-Indian fee land. On appeal, the Crow Court of Appeals agreed that the Tribe did not exceed its authority in enforcing § 219 of RUTC and that Big Horn violated that provision by passing the utility tax through to Crow customers on a dollar-for-dollar basis.

In response, Big Horn filed a complaint in federal district court seeking injunctive and declaratory relief against several tribal officers ("defendants"), including the tax commissioner, the members of the Crow Public Utility Commission, and judges of the Crow tribal court. Big Horn also sought a refund of all unlawfully collected utility taxes. Both parties filed for summary judgment and the district court granted Big Horn's motion, holding that the Tribe exceeded its jurisdiction in taxing utility property located on congressionally-granted rights-of-way, the equivalent of non-Indian fee land under *Strate v. A–1 Contractors*, 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997). As a result, the district court granted a permanent injunction prohibiting any future assessment of the utility tax against Big Horn, and further ordered the defendants to refund all utility taxes previously paid by Big Horn. The district court also denied the defendants' motion to vacate the order granting summary judgment and for an injunction pending appeal. Pursuant to an emergency motion, however, this court granted an injunction pending appeal. The tribal offi-

cials appeal from the district court's final judgment.

## II.

A district court's grant of summary judgment is reviewed de novo. *See Robi v. Reed*, 173 F.3d 736, 739 (9th Cir. 1999). The standard of review for an Indian tribal court decision deciding jurisdictional issues is de novo on questions of federal law and clearly erroneous for factual questions. *See FMC v. Shoshone–Bannock Tribes*, 905 F.2d 1311, 1313 (9th Cir.1990). Questions about tribal jurisdiction over non-Indians is an issue of federal law reviewed de novo. *See United States ex. rel. Morongo Band of Mission Indians v. Rose*, 34 F.3d 901, 905 (9th Cir.1994).

## A.

As a preliminary matter, we must determine whether Big Horn's utility property is located on the equivalent of non-Indian fee land. The United States Supreme Court has stated on several occasions that an Indian tribe's jurisdiction over nonmember conduct on non-Indian fee land is extremely limited. *See Strate*, 520 U.S. at 445–46, 117 S.Ct. 1404; *Montana*, 450 U.S. at 565–67, 101 S.Ct. 1245. Therefore, because Big Horn is not a tribal entity, the classification of the congressionally-granted rights-of-way are vital to determining whether RUTC should be subject to the more limiting standard of tribal jurisdiction delineated in *Montana* and its progeny. *See Montana*, 450 U.S. at 564–66, 101 S.Ct. 1245.[1]

In a recent decision on tribal jurisdiction, the Supreme Court considered whether a tribal court exceeded its adjudicative jurisdiction by entertaining a tort claim arising out of an accident that occurred on a portion of a state highway that crossed

---

1. The defendants belatedly claim that "Big Horn is not purely a non-tribal entity as the district court assumed" because the Tribe and its Crow customers constitute approximately half of Big Horn's total membership. The defendants' assertion, however, is unsupported by authority and is too vague to provide a sufficient basis for holding that Big Horn is a tribal entity.

through Indian trust land. *See Strate*, 520 U.S. at 442, 117 S.Ct. 1404. The state highway in *Strate* was built on a right-of-way granted by the federal government pursuant to 25 U.S.C. §§ 323–28, the same authority used to grant Big Horn's easements for its transmission and distribution lines. *See id.* at 454, 117 S.Ct. 1404. The Supreme Court considered the following factors before ultimately concluding that the state highway was the equivalent of ·non-Indian fee land: (1) the legislation creating the right-of-way; (2) whether the right-of-way was acquired with the consent of the tribe; (3) whether the tribe had reserved the right to exercise dominion and control over the right-of-way; (4) whether the land was open to the public; and (5) whether the right-of-way was under state control. *See id.* at 454–56, 117 S.Ct. 1404; *Montana Dep't of Transp. v. King*, 191 F.3d 1108, 1113 n. 1 (9th Cir. 1999). Although the Court was considering only a tribe's adjudicative jurisdiction in *Strate*, it also was careful to point out that "a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction," implying that the *Strate* analysis is equally applicable to a tribe's legislative and regulatory authority. *Strate*, 520 U.S. at 453, 117 S.Ct. 1404.

This court further clarified the *Strate* analysis in *Burlington Northern R.R. Co. v. Red Wolf*, 196 F.3d 1059 (9th Cir.1999). *Red Wolf* involved a tribe's adjudicative jurisdiction over a tort claim that arose when a train collided with an automobile on a railroad located on a congressionally-granted right-of-way. In finding that there was no "principled distinction to be made between the jurisdictional analysis applicable to a congressionally-granted highway right-of-way and a congressionally-granted railroad right-of-way," this court found it decisive, consistent with *Strate*, that the tribe had failed to reserve its right to exercise "dominion or control over the right-of-way." *Id.* Significantly, the right-of-way in *Red Wolf* was not under the control of the state and was not open to the public, the same two characteristics that distinguish the present action from *Strate*.

As in *Red Wolf*, Big Horn's easements meet only the first three criteria in *Strate*. First, the United States created Big Horn's easements pursuant to the same federal statute that created the right-of-way in *Strate*. Second, Big Horn's easements were created with the consent of the Tribe. Finally, in the granting instrument, the Tribe did not reserve any right to exercise dominion or control over Big Horn's rights-of-way. As a result, it is beyond dispute that the first three factors in *Strate* are satisfied. The defendants, however, argue that Big Horn's rights-of-way are distinguishable because they are not open to the public or under state control. While the defendants' observation is correct, that distinction is immaterial following this court's decision in *Red Wolf*, which presents a virtually indistinguishable factual scenario. Furthermore, the Supreme Court pronounced in *Strate* that legislative and adjudicative jurisdiction are coextensive, so there is no merit to the contention that *Red Wolf* and *Strate* are inapplicable because they fixed only the limits of adjudicative jurisdiction.

Under *Red Wolf* and *Strate*, therefore, Big Horn's rights-of-way are the equivalent of non-Indian fee land for the purpose of considering the limits of the Tribe's regulatory jurisdiction.

### B.

This court's post-*Strate* jurisprudence leaves no doubt that *Montana*'s framework applies in determining a tribe's jurisdiction over nonmembers on non-Indian fee land, the precise situation presented by this case. *See Red Wolf*, 196 F.3d at 1064 (stating that *Montana* applies because a congressionally-granted right-of-way is the equivalent of non-Indian fee land); *Allstate Indem. Co. v. Stump*, 191 F.3d 1071, 1074 (9th Cir.1999) ("Generally speaking, the *Montana* rule governs only disputes arising on non-Indian fee land, not dis-

putes on tribal land; otherwise, the *Strate* Court's analysis of why a state highway on tribal land was equivalent to non-tribal land would have been unnecessary."). *Montana* was the first opinion to establish a framework for analyzing the contours of tribal jurisdiction over non-Indians.

■ Montana's main rule is that absent a treaty or a federal law, a tribe has no civil regulatory authority over tribal nonmembers. *See Montana,* 450 U.S. at 564–65, 101 S.Ct. 1245. The main rule is subject only to the following two exceptions: (1) "[a] tribe may regulate, through taxation, licensing, or other means, *the activities* of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases or other arrangements"; and (2) "[a] tribe may also retain inherent power to exercise civil authority over *the conduct* of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 565, 101 S.Ct. 1245 (emphasis added).

■ The first exception allows a tribe to exercise jurisdiction over the activities of nonmembers who enter into a consensual relationship with a tribe. The district court correctly concluded that Big Horn formed a consensual relationship with the Tribe because Big Horn entered into contracts with tribal members for the provision of electrical services. While the agreements creating Big Horn's rights-of-way were insufficient to create a consensual relationship with the Tribe, *see Red Wolf,* 196 F.3d at 1064, Big Horn's voluntary provision of electrical services on the Reservation did create a consensual relationship. *See Strate,* 520 U.S. at 457, 117 S.Ct. 1404; *Montana,* 450 U.S. at 565, 101 S.Ct. 1245. Even with the presence of a consensual relationship, however, the first exception in *Montana* does not grant a tribe unlimited regulatory or adjudicative jurisdiction over a nonmember. Rather, *Montana* limits tribal jurisdiction under

the first exception to the regulation of "the activities of nonmembers who enter [into] consensual relationships." *Montana,* 450 U.S. at 565, 101 S.Ct. 1245. An ad valorem tax on the value of Big Horn's utility property is not a tax on the activities of a nonmember, but is instead a tax on the value of property owned by a nonmember, a tax that is not included within *Montana*'s first exception.

■ Alternatively, the defendants argue that the second *Montana* exception applies because the revenues created by the utility tax finance important tribal services and are, therefore, essential to the continued well-being of the Tribe. The defendants read this exception far too broadly. The Supreme Court has given *Montana*'s second exception a narrow construction, *see Strate,* 520 U.S. at 458–59, 117 S.Ct. 1404 and *County of Lewis v. Allen,* 163 F.3d 509, 515 (9th Cir.1998), and only allows a tribe to do "what is necessary to protect tribal self-government or to control internal relations." *Strate,* 520 U.S. at 459, 117 S.Ct. 1404. The defendants' request for us to expand *Montana*'s second exception would effectively swallow *Montana*'s main rule, because virtually any tribal tax would then fall under the second exception, a result that the Supreme Court has never endorsed and which conflicts with the Supreme Court's view that tribal jurisdiction is limited. *See Strate,* 520 U.S. at 458, 117 S.Ct. 1404 (citing *Montana Catholic Missions v. Missoula County,* 200 U.S. 118, 26 S.Ct. 197, 50 L.Ed. 398 (1906) and *Thomas v. Gay,* 169 U.S. 264, 18 S.Ct. 340, 42 L.Ed. 740 (1898)). Furthermore, the defendants' claim that the Tribe's treasury would be irreparably harmed and that essential tribal services would have to be scaled back are similarly unpersuasive, because the Tribe is free to adopt a different tax scheme that complies with *Montana.*

Therefore, because neither *Montana* exception applies, the Tribe lacks jurisdiction

to impose an ad valorem tax on Big Horn's utility property.

## C.

In a final attempt to save RUTC, the defendants argue that the Tribe possesses the inherent sovereign authority to impose an ad valorem tax because Big Horn's utility property is located within the exterior boundaries of the Reservation. In support of its argument, the defendants rely heavily on *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) and *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980). While both cases contain broad language regarding tribal taxation powers, neither case abrogates *Montana*'s main rule.

In *Colville,* the Supreme Court considered whether a tribe possessed the inherent sovereign authority to tax on-reservation cigarette sales to non-Indians. *See Colville,* 447 U.S. at 152, 100 S.Ct. 2069. The Court began its analysis by stating the general rule that a tribe may tax transactions occurring on trust or Indian fee lands, unless it is divested of that authority by federal law or by the necessary implication of its dependent status. *See id.* Acting consistent with *Montana*'s main rule and its exceptions, the Court noted that nonmembers may only be taxed to the extent they enter "the reservation to engage in economic activity" or "where the tribe has a significant interest in the subject matter." *Id.* Furthermore, *Colville* addressed a tribe's inherent sovereign authority to tax property and limited that power to the "property of non-Indians ... situated on Indian lands." *Colville,* 447 U.S. at 153, 100 S.Ct. 2069 (emphasis added). Therefore, while *Colville* is a tribal tax case, it directly addresses only Indian taxation power over transactions occurring on Indian land and in dicta appears to support *Montana*'s conclusion that tribal taxation power over property located on non-Indian fee land is extremely narrow.

Similarly, *Merrion* recognized that a tribe's power to tax transactions occurring on tribal or trust lands "is a fundamental attribute of sovereignty," but did not directly address a tribe's power to tax property located on the equivalent of non-Indian fee land. Indeed, as in *Colville,* the Supreme Court indicated that the inherent sovereign power of taxation exists only when the taxpayer is located within the tribe's territorial jurisdiction or when a taxpayer avails itself "of the 'substantial privilege of carrying on business' on the reservation." *Merrion,* 455 U.S. at 137, 102 S.Ct. 894. The Court also recognized, consistent with *Montana,* that "a tribe has no authority over a nonmember until the nonmember enters tribal lands or conducts business with the tribe." *Id.* at 142, 102 S.Ct. 894. These statements in *Merrion* provide no support for the defendants' argument that the Tribe's inherent sovereign authority supports its ad valorem tax on Big Horn's utility property. Instead, *Merrion* actually lends support to *Montana*'s application in this case because to the extent it expresses an opinion about a tribe's taxation of property located on non-Indian fee land, its language indicates that such a tax would be an impermissible extension of tribal jurisdiction.

Finally, the language of *Montana* itself refutes the defendants' contention that *Montana* does not apply to tribal taxation cases. Indeed, *Montana* cited several tax cases that would be covered by its main rule. *See Montana,* 450 U.S. at 565–66, 101 S.Ct. 1245; *Morris v. Hitchcock,* 194 U.S. 384, 393, 24 S.Ct. 712, 48 L.Ed. 1030 (1904) (upholding a tribal permit tax on nonmember-owned livestock); *Thomas,* 169 U.S. at 273, 18 S.Ct. 340 (considering whether a territorial tax placed on the cattle of non-Indian lessees was beyond the reach of the state). The defendants' argument is also controverted by the plain language of *Montana*'s first exception, which expressly applies to a tribe's taxation of nonmembers. *See Montana,* 450 U.S. at 565, 101 S.Ct. 1245 ("A tribe may

regulate, through *taxation,* licensing or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.") (emphasis added).

██ As a result, we see no principled reason to depart from *Montana* and, therefore, hold that the Tribe's ad valorem tax on the value of Big Horn's utility property exceeds the Tribe's regulatory jurisdiction. Our holding is also consistent with the fundamental rule that it is "essential to the validity of ... [of an ad valorem tax] that the property shall be within the territorial jurisdiction of the taxing power." *Union Refrigerator Transit Co. v. Kentucky,* 199 U.S. 194, 204, 26 S.Ct. 36, 50 L.Ed. 150 (1905). Here, it is apparent that the ad valorem tax as applied to Big Horn's utility property exceeds the Tribe's territorial jurisdiction and is accordingly invalid. *Cf. South Dakota v. Bourland,* 508 U.S. 679, 694–95, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993) (stating that the inherent sovereign authority of a tribe is a limited source of tribal power).

### D.

We must also address whether this court's decision in *Burlington Northern R.R. Co. v. Blackfeet Tribe,* 924 F.2d 899, 904 (9th Cir.1991), has been overruled by our decision today. The defendants correctly argue that *Blackfeet Tribe* is on all fours with this case and would accordingly control in the absence of intervening Supreme Court authority. However, *Blackfeet Tribe* was decided on the erroneous premise following *Strate* that a congressionally-granted right-of-way is an easement in which a tribe retains "a continuing property interest." *Id.* at 902 n. 5. *Strate* impliedly overruled *Blackfeet Tribe* by holding that a congressionally-granted right-of-way is the equivalent of non-Indian fee land. Under *Strate,* therefore, the ad valorem tax in *Blackfeet Tribe,* like the tax in this case, should have been subjected to a *Montana* analysis. *See, e.g.,* Con-ference of Western Attorneys General, American Indian Law Deskbook 312 (2d ed. 1998) ("The continuing validity of [*Blackfeet Tribe*], in any event, is problematic given the Supreme Court's subsequent decision in *Strate v. A–1 Contractors* ....."). *Blackfeet Tribe*'s failure to apply *Montana* undermines its precedential value.

Because the result in *Blackfeet Tribe* was based upon the classification of the right-of-way as Indian land, *see Blackfeet Tribe,* 924 F.2d at 902, and that status has been subsequently altered by *Strate, Blackfeet Tribe* is no longer good law. In addition, the tax cannot be justified on the basis of the Tribe's inherent sovereign authority either, because the tax is no longer on property classified as Indian land. Therefore, in light of *Strate, Blackfeet Tribe* is overruled to the extent it upholds an ad valorem tax on property located on a congressionally-granted right-of-way. *See Hill v. Blind Indus.,* 179 F.3d 754, 762 (9th Cir.1999) ("[W]hen existing Ninth Circuit precedent has been undermined by subsequent Supreme Court decisions, this court may reexamine that precedent without the convening of an en banc panel.").

### III.

██ The defendants also argue that Big Horn conceded in the Crow Tribal Court that the Tribe possessed the authority to tax property located on a congressionally-granted right-of-way. However, an exception to the waiver rule exists for intervening changes in the law. *See Curtis Publishing Co. v. Butts,* 388 U.S. 130, 142–43, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *USA Petroleum v. Atlantic Richfield Co.,* 13 F.3d 1276, 1285 (9th Cir.1992). At the time this case was being litigated in the Crow tribal court, *Strate* had not yet been decided. Thus, it was reasonable for Big Horn to assume that the Tribe possessed the authority to tax Big Horn's utility property in light of this court's decision in *Blackfeet Tribe.* Indeed, *Strate*

was not decided until the case reached the Crow Court of Appeals. At that time, Big Horn provided supplemental briefing that argued, in light of *Strate*, that the Tribe had exceeded its jurisdiction in taxing Big Horn's utility property. Because *Strate* is an intervening change in the law and Big Horn altered its stance in the litigation once *Strate* was decided, the defendants' waiver argument fails.

## IV.

The defendants' final contention on appeal is that the district court's order violated the Tribe's sovereign immunity. Specifically, the defendants argue that both the permanent injunction and the order requiring the Tribe to refund past utility taxes paid by Big Horn violated the Tribe's sovereign immunity. Although the district court's order was not completely clear about whether the tax refund awarded to Big Horn was against the tribal officers in their official or personal capacities, it appears that it was awarded against them in their official capacity. The utility taxes were collected and spent by the Tribe, and the posture of this case suggests that the district court did not intend to make the tribal officers personally liable. Any discussion about individual immunities, therefore, is unnecessary.

### A.

Federally recognized Indian tribes enjoy sovereign immunity from suit because they are "domestic dependent nations" that exercise inherent sovereign authority over their members and territories. *See Pit River Home & Agricultural Coop. Assoc. v. United States,* 30 F.3d 1088, 1100 (9th Cir.1994). As a matter of federal law, therefore, a tribe possesses immunity from suit unless Congress has abrogated that immunity or the Tribe has waived it. *See Kiowa Tribe of Oklahoma v. Manufacturing Techs., Inc.,* 523 U.S. 751, 754, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998). This court recognized in *Blackfeet Tribe,* in a part of the opinion not overruled by *Strate,*

that suits for prospective injunctive relief are permissible against tribal officers under the *Ex Parte Young* framework. *See Blackfeet Tribe,* 924 F.2d at 901 ("[T]ribal officials are not immune from suit to test the constitutionality of the taxes they seek to collect."). As a result, the district court's decision to permanently enjoin the defendants from applying RUTC to Big Horn's utility property did not violate principles of sovereign immunity because, as stated above, the officials acted in violation of federal law in enforcing the tax.

In contrast, the district court's decision to refund all past utility taxes paid by Big Horn does violate the Tribe's sovereign immunity. The Supreme Court has recognized that a retrospective award of taxes is barred by sovereign immunity. *See Oklahoma Tax Comm'n v. Citizen Band of Potawatomi Tribe of Oklahoma,* 498 U.S. 505, 514, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991) (recognizing that tribal sovereign immunity prevents a state from collecting taxes from a tribe); *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985) ("We have refused to extend the reasoning of *Young,* however, to claims for retrospective relief."); *Ford Motor Co. v. Dep't of Treasury of Indiana,* 323 U.S. 459, 462–63, 65 S.Ct. 347, 89 L.Ed. 389 (1945) (holding that a taxpayer cannot maintain an action against a state official for a refund of taxes paid). Because the tax refund is the type of retrospective relief that the Supreme Court has struck down as a violation of sovereign immunity, we reverse the district court's order awarding retrospective relief to Big Horn.

### B.

Big Horn argues that § 215 of RUTC is an express waiver of the Tribe's sovereign immunity. That provision grants a taxpayer the right to apply to the Tribe's tax commissioner for a refund. If the taxpayer is not satisfied with the tax commissioner's decision, it may then ap-

peal to the Crow Tribal Court. *See* RUTC, § 212. Sections 212 and 215 describe the exclusive avenues available for a taxpayer to challenge the imposition of the utility tax. RUTC does not authorize a lawsuit in federal court or any other forum. Although a tribe may waive its sovereign immunity, *see Kescoli v. Babbitt,* 101 F.3d 1304, 1310 (9th Cir.1996), such a waiver must be "express and unequivocal." *Arizona Public Serv. Co. v. Aspaas,* 77 F.3d 1128, 1133 (9th Cir.1996). In addition, a waiver of immunity in state court does not ordinarily waive immunity in federal court. *See Broughton Lumber Co. v. Columbia River Gorge Comm'n,* 975 F.2d 616, 619–20 (9th Cir.1992).

In this case, the Tribe vested jurisdiction over refund claims only in the tax commissioner and the tribal courts. The Tribe never consented to suit in federal court. Indeed, RUTC expressly states that "the remedies provided in § 211 through § 215 shall be exclusive" and that no other suits are allowed. *See* RUTC, § 218. Therefore, to the extent the Tribe waived its sovereign immunity in tribal court, that waiver was insufficient to waive sovereign immunity in federal court.

### V.

In sum, the Tribe exceeded its regulatory jurisdiction in assessing an ad valorem tax on the value of Big Horn's utility property located on the equivalent of non-Indian fee land. We, therefore, affirm the district court's award of a permanent injunction to Big Horn, but reverse the order requiring the Tribe to refund all past utility taxes paid by Big Horn on sovereign immunity grounds.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.** Each party shall bear their own costs.